# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 11, 2019                Decided June 4, 2019

No. 18-1218

LORI BIRCKHEAD, ET AL.,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

TENNESSEE GAS PIPELINE COMPANY, LLC,
INTERVENOR

———

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

———

*Carolyn Elefant* argued the cause and filed the briefs for petitioners.

*Robert H. Solomon*, Solicitor, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *James P. Danly*, General Counsel, and *Scott Ray Ediger*, Attorney. *Elizabeth E. Rylander*, Attorney, entered an appearance.

*Brian D. O'Neill* argued the cause for intervenor. With him on the brief were *Michael R. Pincus* and *Frances Bishop Morris*.

Before: GARLAND, *Chief Judge*, and TATEL and WILKINS, *Circuit Judges*.

Opinion for the Court filed PER CURIAM.

PER CURIAM: Residents and business owners have petitioned for review of the Federal Energy Regulatory Commission's decision to authorize the construction and operation of a new natural gas compression facility in Davidson County, Tennessee. They argue that the Commission violated the National Environmental Policy Act (NEPA) by failing to adequately assess alternatives and by failing to consider the environmental effects of increased gas production and consumption related to the project. For the reasons set forth below, we deny the petition.

**I.**

In early 2015, Tennessee Gas Pipeline Co. applied for a certificate of public convenience and necessity for the Broad Run Expansion Project. Designed to enhance the company's capacity to transport pressurized natural gas through the interstate pipeline network to markets in the southeastern United States, the Project called for construction of several gas compression facilities in Kentucky, Tennessee, and West Virginia. The most controversial of these facilities—at least as far as petitioners are concerned—was Compressor Station 563, which Tennessee Gas proposed to build near petitioners' Nashville homes and businesses.

The Commission completed an Environmental Assessment of the Project in March 2016 and issued a certificate order later that year. Shortly thereafter, petitioners—collectively referred to here as "Concerned Citizens" because of their affiliation with local advocacy group Concerned

Citizens for a Safe Environment—sought rehearing, arguing that the Commission violated NEPA in two ways: by inadequately evaluating alternatives to the Project and by failing to address reasonably foreseeable indirect environmental effects resulting from increased gas production "upstream" from the compressor station and increased gas combustion "downstream" from the facility.

The Commission denied the request for rehearing in June 2018, s*ee Tennessee Gas Pipeline Co.*, 163 FERC ¶ 61,190 (2018) ("Rehearing Order"), and Concerned Citizens timely petitioned for review, raising the same two challenges.

## II.

"[W]e apply [an] arbitrary and capricious standard [of review] to a NEPA challenge." *Nevada v. Department of Energy*, 457 F.3d 78, 87 (D.C. Cir. 2006). Our role is not to "'flyspeck' an agency's environmental analysis, looking for any deficiency no matter how minor," *id.* at 93, but instead "simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious," *Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 97–98 (1983). Accordingly, we ask whether the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Manufacturers Ass'n, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).

## A.

The regulations implementing NEPA provide that an Environmental Assessment must briefly discuss "reasonable

alternatives to the proposed action" and compare the respective environmental impacts of each. *Myersville Citizens for a Rural Community, Inc. v. FERC*, 783 F.3d 1301, 1323 (D.C. Cir. 2015) (citing 40 C.F.R. § 1508.9(b)). "[T]he discussion of environmental effects of alternatives need not be exhaustive. What is required is information sufficient to permit a reasoned choice . . . ." *Natural Resources Defense Council, Inc. v. Morton*, 458 F.2d 827, 836 (D.C. Cir. 1972).

Concerned Citizens first contend that the Commission acted arbitrarily and capriciously by selecting the proposed site for Compressor Station 563 over an allegedly environmentally superior alternative location. We disagree. The Environmental Assessment reflects that, in addition to Tennessee Gas's proposed site, the Commission considered twelve alternatives—including Concerned Citizens' favored site—and evaluated each with respect to eighteen different environmental factors. Acknowledging that several factors weighed in favor of Concerned Citizens' site, the Commission pointed out in the certificate order that other legitimate environmental factors weighed in favor of the proposed site. The Commission explained that "[b]ased on [an] overall assessment of the various factors, which do not necessarily carry equal weight, . . . [Concerned Citizens'] alternative site . . . does not have a significant advantage over the proposed site." *Tennessee Gas Pipeline Co.*, 156 FERC ¶ 61,157, at P 111 (2016) ("Certificate Order"). That explanation is sufficient under NEPA.

We also reject Concerned Citizens' related claim that the Commission violated NEPA by failing to consider the possibility that locating Compressor Station 563 at an alternative site more centrally located between two existing stations would enable Tennessee Gas to reduce emissions from the facility by forty percent. The Commission explained in its rehearing order that any resulting "improvement in air quality

impacts" would "not be significant," Rehearing Order, at P 26, because the Project as a whole would "not have a significant impact on regional air quality," *id.* (citing Broad Run Expansion Project Environmental Assessment ("Environmental Assessment") 104, Joint Appendix 321). Because petitioners point to no record evidence that undermines that conclusion, and because, as previously noted, the Commission identified certain other environmental factors that weigh in favor of the proposed site, we have no basis for saying that the Commission's alternatives analysis was arbitrary or capricious.

Nor did the Commission err by placing some "weight upon avoidance of unnecessary use of eminent domain when analyzing alternatives to the proposed site." Respondent's Br. 27. The Commission has long expressed a preference for minimizing the need for certificate holders to resort to eminent domain to acquire land for a given project. *See, e.g.*, *Florida Gas Transmission Co.*, 100 FERC ¶ 61,282, at P 27 n.16 (2002) ("Although a certificate confers the power of eminent domain on the certificate holder, the Commission much prefers that pipelines acquire sites for permanent, aboveground facilities from willing sellers without the need to rely on condemnation proceedings."). And, notwithstanding Concerned Citizens' assertion to the contrary, there is no indication that the Commission treated this factor as dispositive here. *See* Rehearing Order, at P 25 ("[A]lthough site ownership *is not dispositive*, the avoidance of the need to exercise eminent domain is a relevant factor in evaluating the suitability of a site under consideration." (emphasis added)). Under the circumstances of this case, the Commission's selection of the proposed site was reasonable. NEPA requires nothing more.

We are similarly unpersuaded by petitioners' contention that the Commission violated NEPA by failing to adequately

consider the option of building a smaller compressor station at the proposed site. The Commission addressed that possibility both in the certificate order and the rehearing order, explaining that its engineering staff had reviewed the flow diagrams and hydraulic models submitted by Tennessee Gas and concluded that "Compressor Station 563[] [was] properly designed to provide the additional 200,000 Dth/d of incremental capacity proposed for the project." Certificate Order, at P 17; *see also* Rehearing Order, at P 7 (reiterating that the Commission's engineering staff found that the Project, "including Compressor Station 563," was "properly designed"). We decline Concerned Citizens' invitation to second-guess the Commission's informed conclusion on this highly technical point. *See, e.g.*, *Delaware Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014) ("Where an issue requires a high level of technical expertise, we defer to the informed discretion of the [Commission]." (alteration in original) (internal quotation marks omitted)).

**B.**

During the NEPA review process, the Commission "must consider not only the direct effects, but also the *indirect* environmental effects" of a pipeline project. *Sierra Club v. FERC*, 867 F.3d 1357, 1371 (D.C. Cir. 2017). Indirect effects are those that "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable," 40 C.F.R. § 1508.8(b), meaning that "they are sufficiently likely to occur [such] that a person of ordinary prudence would take [them] into account in reaching a decision," *Sierra Club*, 867 F.3d at 1371 (second alteration in original) (internal quotation marks omitted). Here the Commission declined to consider the impacts of upstream gas production and downstream gas combustion, concluding instead that such impacts did not qualify as indirect effects.

Concerned Citizens claim that decision was both arbitrary and capricious and a violation of NEPA.

Heeding a famous and sensible instruction, we "[b]egin at the beginning" of the pipeline, with the challenge to the Commission's failure to consider the impacts of upstream gas production. Lewis Carroll, *Alice's Adventures in Wonderland* 142 (Edmund R. Brown ed., International Pocket Library 1936) (1865). At oral argument, the Commission conceded that there may well be instances in which upstream gas production is both reasonably foreseeable and sufficiently causally connected to a pipeline project to qualify as an indirect effect. *See* Oral Arg. Rec. 38:26–39:29. But according to the Commission, unless the record demonstrates that the proposed project represents the *only* way to get additional gas "from a specified production area" into the interstate pipeline system, Certificate Order, at P 68, no such "reasonably close causal relationship" exists, *id.* at P 65 (internal quotation marks omitted); *see also id.* at P 68 (explaining the Commission's position that gas production is sufficiently causally connected to a pipeline project only if "there will be no . . . way to move the gas" from a given production area in the absence of the proposed project).

The record in this case, the Commission contends, is devoid of the information necessary to establish that causal relationship. And even assuming causation, the Commission continues, the environmental effects of any upstream gas production induced by this project would not be reasonably foreseeable because the source area for the gas to be transported is ill-defined and "the number or location of any additional wells are matters of speculation." *Id.* at P 82. Commissioner LaFleur, who concurred in the rehearing order, suggested that "[o]ne reason the Commission lacks the specificity of information to determine causation and reasonable foreseeability is *because we have not asked*

applicants to provide this sort of detail." Rehearing Order, 2018 WL 2986387, *21 n.184 (LaFleur, Comm'r, concurring) (emphasis added). According to the Commission, however, asking for such information "would be an exercise in futility," because the applicants themselves are unlikely to have it. *Id.* at P 60. Concerned Citizens have failed to either persuasively rebut the Commission's analysis or meaningfully dispute its assertion of futility.

To begin with, Concerned Citizens have identified no record evidence that would help the Commission predict the number and location of any additional wells that would be drilled as a result of production demand created by the Project. Moreover, although they suggest that Antero, the natural gas producer and shipper that has contracted with Tennessee Gas for the Project's extra transportation capacity, "would not extract and produce [the] gas" in the absence of the Project "because it would not have the ability to bring the gas to market," Petitioners' Br. 41, Concerned Citizens cite no evidence supporting that allegation. Instead, they merely point to the Commission's determination that there is a "need" for the Project "based on the fact that Tennessee [Gas] has executed a binding precedent agreement for . . . 100 percent of the design capacity." Certificate Order, at P 17. We have repeatedly held that a project applicant may demonstrate market need "by presenting evidence of preconstruction contracts for gas transportation service." *Sierra Club*, 867 F.3d at 1379 (internal quotation marks omitted)). But just because the Commission is satisfied there is a market need for a given project does not necessarily mean that a shipper/producer "would not have the ability to bring the gas to market" via another channel were the Commission to deny a certificate for the project. Petitioners' Br. 41. And although we are dubious of the Commission's assertion that asking Tennessee Gas to provide additional information about the origin of the gas

would be futile, Concerned Citizens nowhere claim that the Commission's failure to seek out additional information constitutes a violation of its obligations under NEPA. We are thus left with no basis for concluding that the Commission acted arbitrarily or capriciously or otherwise violated NEPA in declining to consider the environmental impacts of upstream gas production.

This brings us to the other end of the pipeline and to whether the Commission reasonably declined to consider greenhouse-gas emissions and other environmental impacts related to *downstream* gas consumption. The parties' dispute on this point centers largely on the breadth of our court's 2017 decision in *Sierra Club v. FERC*. In that case, we held that downstream greenhouse-gas emissions resulting from the combustion of natural gas were a reasonably foreseeable indirect effect of a pipeline project designed to transport gas to certain power plants in Florida. *See Sierra Club*, 867 F.3d at 1371–72.

According to Concerned Citizens, the Commission's refusal to quantify or otherwise consider downstream emissions related to the Broad Run Expansion Project directly contravenes *Sierra Club*, which they characterize as standing for the general proposition that combustion-related emissions are necessarily a reasonably foreseeable indirect effect of a pipeline project that "must be considered and quantified by the Commission under NEPA." Petitioners' Reply Br. 17.

For its part, the Commission contends that far from "establishing a bright-line rule that [it] must evaluate downstream . . . greenhouse gas emissions in all circumstances," *Sierra Club* is narrowly limited to the facts of that case. Respondent's Br. 34–35. The Commission emphasizes that in *Sierra Club*, "the destination and use of the

gas were actually known." *Id.* at 35. For that reason, and for that reason only, the Commission says, "it was reasonably foreseeable that the gas would be burned by those power plants and produce new greenhouse gas emissions at their respective locations." *Id.* Here, as the Commission sees it, the circumstances are markedly different because the destination and the end user (or users) remain a mystery; all that is known is that the gas is headed somewhere in the Southeast. As a result, the Commission claims, it is impossible to assess whether the Project will result in increased emissions overall or offset emissions by reducing demand for other (perhaps dirtier) fuel sources. According to the Commission, then, unlike in *Sierra Club*, "[a]ny attempt to quantify downstream . . . emissions on the record before us" in this case "would result in a number so imprecise as to be meaningless." Rehearing Order, at P 61.

Neither side has it exactly right. As an initial matter, the Commission is wrong to suggest that downstream emissions are not reasonably foreseeable simply because the gas transported by the Project may displace existing natural gas supplies or higher-emitting fuels. Indeed, that position is a total non-sequitur: as we explained in *Sierra Club*, if downstream greenhouse-gas emissions otherwise qualify as an indirect effect, the mere possibility that a project's overall emissions calculation will be favorable because of an "offset . . . elsewhere" does not "excuse[]" the Commission "from making emissions estimates" in the first place. 867 F.3d at 1374–75. For their part, Concerned Citizens go too far to the extent they claim emissions from downstream gas combustion are, as a categorical matter, always a reasonably foreseeable indirect effect of a pipeline project. *See Calvert Cliffs' Coordinating Committee, Inc. v. U.S. Atomic Energy Commission*, 449 F.2d 1109, 1122 (D.C. Cir. 1971) ("NEPA compels a case-by-case examination . . . of discrete factors.").

But contrary to the Commission's position, *Sierra Club* hardly suggests that downstream emissions are an indirect effect of a project only when the project's "entire purpose" is to transport gas to be burned at "specifically-identified" destinations. Respondent's Br. 35. Indeed, the Commission itself backed away from this extreme position during oral argument in *Otsego 2000*, a companion case heard the same day as this one. *See* Oral Arg. Rec. 25:48–26:27, *Otsego 2000 v. FERC*, No. 18-1188 (D.C. Cir. Apr. 11, 2019) (acknowledging that whether downstream greenhouse-gas emissions qualify as an indirect effect "has to be [decided] on a case-by-case basis because every one of these projects is different" and declining "to draw a line that . . . is not mandated by the Court"). *Sierra Club* therefore falls short of resolving this case in favor of either party.

The Commission suggests an alternative justification: that it need not consider downstream greenhouse-gas emissions if it "'cannot be considered a legally relevant cause'" of such emissions due to its lack of jurisdiction over any entity other than the pipeline applicant. Respondent's Br. 37 (quoting *Department of Transportation v. Public Citizen*, 541 U.S. 752, 770 (2004)); *see also* Apr. 15, 2019 Letter from the Commission ("[T]he Commission continues to take the position that . . . jurisdictional limitations in the Natural Gas Act break the causal chain for NEPA purposes in most circumstances." (internal quotation marks omitted)). But this line of reasoning gets the Commission nowhere. Although it is true that "[a]n agency has no obligation to gather or consider environmental information if it has no statutory authority *to act on that information*," in the pipeline certification context the Commission *does* have statutory authority to act. *Sierra Club*, 867 F.3d at 1372. As we explained in *Sierra Club*, "Congress broadly instructed the [Commission] to consider 'the public convenience and necessity' when evaluating applications to

construct and operate interstate pipelines." *Id.* at 1373 (quoting 15 U.S.C. § 717f(e)). Because the Commission may therefore "deny a pipeline certificate on the ground that the pipeline would be too harmful to the environment, the agency is a 'legally relevant cause' of the direct and indirect environmental effects of pipelines it approves"—even where it lacks jurisdiction over the producer or distributor of the gas transported by the pipeline. *Id.* Accordingly, the Commission is "not excuse[d] . . . from considering these indirect effects" in its NEPA analysis. *Id.*

We are left, then, to decide whether the Commission acted reasonably in declining to consider greenhouse-gas emissions and other environmental impacts from downstream gas combustion in this particular case. We are troubled, as we were in the upstream-effects context, by the Commission's attempt to justify its decision to discount downstream impacts based on its lack of information about the destination and end use of the gas in question. *See, e.g.*, Rehearing Order, at P 61 ("The Commission does not know where the gas will ultimately be consumed or what fuels it will displace, and likely neither does the entity over which the Commission has jurisdiction . . . ."). "NEPA analysis necessarily involves some 'reasonable forecasting,' and . . . agencies may sometimes need to make educated assumptions about an uncertain future." *Sierra Club*, 867 F.3d at 1374 (quoting *Delaware Riverkeeper Network*, 753 F.3d at 1310)). It should go without saying that NEPA also requires the Commission to at least *attempt* to obtain the information necessary to fulfill its statutory responsibilities. *See Delaware Riverkeeper Network*, 753 F.3d at 1310 ("While the statute does not demand forecasting that is not meaningfully possible, an agency must fulfill its duties to the fullest extent possible." (internal quotation marks omitted)); *see also Barnes v. U.S. Department of Transportation*, 655 F.3d 1124, 1136 (9th Cir. 2011) ("While foreseeing the

unforeseeable is not required, an agency must use its best efforts to find out all that it reasonably can." (internal quotation marks omitted)).

In this case, the Commission made no effort to obtain the missing information from Tennessee Gas. As Commissioner Glick observed in his partial dissent from the rehearing order, "[i]n deeming an entire category of potential consequences not reasonably foreseeable and any inquiry into the matter an 'exercise in futility,' the Commission excuses itself from making any effort to develop [the] record in the first place." Rehearing Order, 2018 WL 2986387, at *22 (Glick, Comm'r, dissenting in part). Despite initially attempting, once again, to invoke the limited nature of its jurisdiction in order "to point out that there are limitations to [its] ability to ask" for the necessary information, the Commission ultimately conceded during oral argument that its lack of jurisdiction over shippers, distributors, and end users "doesn't preclude or foreclose" it from further developing the record by requesting additional data from the project applicant. Oral Arg. Rec. 27:39–29:50. Although the Commission asserts that the project applicant itself is unlikely to possess the needed information, we are skeptical of any suggestion that a project applicant would be unwilling or unable to obtain it if the Commission were to ask for such data as part of the certificate application process. In fact, when we asked counsel for Tennessee Gas during oral argument "what would have happened if the Commission . . . , as part of your application," had requested that "you . . . ask the shipper/marketer where the gas is coming from," he replied that the company "would have gone to Antero [the shipper] and posed the question." Oral Arg. Rec. 41:37–56. "When the regulator asks us questions," counsel explained, "we generally answer them as promptly as possible and as completely as possible." *Id.* at 43:01–08.

Despite our misgivings regarding the Commission's decidedly less-than-dogged efforts to obtain the information it says it would need to determine that downstream greenhouse-gas emissions qualify as a reasonably foreseeable indirect effect of the Project, Concerned Citizens failed to raise this record-development issue in the proceedings before the Commission. We therefore lack jurisdiction to decide whether the Commission acted arbitrarily or capriciously and violated NEPA by failing to further develop the record in this case. *See* 15 U.S.C. § 717r(b) ("No objection . . . shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do."). Therefore, taking the record as it currently stands, we have no basis for concluding that the Commission acted unreasonably in declining to evaluate downstream combustion impacts as part of its indirect effects analysis.

### III.

For the foregoing reasons, we deny Concerned Citizens' petition for review.

*So ordered.*