# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued February 12, 2021        Decided March 11, 2022

No. 20-1132

FOOD & WATER WATCH AND BERKSHIRE ENVIRONMENTAL
ACTION TEAM,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

EVERSOURCE ENERGY SERVICE COMPANY AND TENNESSEE
GAS PIPELINE COMPANY, LLC,
INTERVENORS

———

On Petition for Review of Orders
of the Federal Energy Regulatory Commission

———

*Adam S. Carlesco* argued the cause and filed the briefs for petitioners. *Zachary B. Corrigan* and *Carolyn Elefant* entered appearances.

*Richard L. Revesz* and *Jason A. Schwartz* were on the brief for *amicus curiae* the Institute for Policy Integrity at New York University School of Law in support of petitioners.

*Susanna Y. Chu*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the

brief were *David L. Morenoff*, Acting General Counsel, *Robert H. Solomon*, Solicitor, and *Robert M. Kennedy*, Senior Attorney.

*Brian D. O'Neill* argued the cause for intervenors. With him on the brief were *Michael R. Pincus* and *Mary E. Grover*.

*Michael L. Murray* and *Matthew J. Agen* were on the brief for *amicus curiae* American Gas Association in support of respondent.

*Jeremy C. Marwell* and *Matthew X. Etchemendy* were on the brief for *amici curiae* Interstate Natural Gas Association of America and American Fuel & Petrochemical Manufacturers in support of respondent.

Before: SRINIVASAN, *Chief Judge*, MILLETT and KATSAS, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* SRINIVASAN.

SRINIVASAN, *Chief Judge*: Two environmental groups, Food & Water Watch and Berkshire Environmental Action Team, petition for review of the Federal Energy Regulatory Commission's decision to authorize a new natural gas pipeline and compressor station in Agawam, Massachusetts. One of those petitioners, Berkshire, has failed to establish its standing to challenge the Commission's decision. The other petitioner, Food & Water Watch, raises a variety of challenges related to the Commission's compliance with the National Environmental Policy Act. In the main, we reject Food & Water Watch's claims. But we agree with its contention that the Commission's environmental assessment failed to account for the reasonably foreseeable indirect effects of the project—specifically, the greenhouse-gas emissions attributable to

burning the gas to be carried in the pipeline. We grant Food & Water Watch's petition for review on that basis and remand for preparation of a conforming environmental assessment.

## I.

## A.

The Natural Gas Act vests the Federal Energy Regulatory Commission with authority to regulate the interstate transportation of natural gas. 15 U.S.C. § 717. To construct or operate an interstate natural gas pipeline, an entity must first obtain "a certificate of public convenience and necessity," 15 U.S.C. § 717f(c), known as a Section 7 certificate, from the Commission.

The Section 7 certificate process incorporates review of proposed projects under the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.* "NEPA establishes an environmental review process under which federal agencies identify the reasonable alternatives to a contemplated action and look hard at the environmental effects of their decisions." *City of Bos. Delegation v. FERC*, 897 F.3d 241, 246 (D.C. Cir. 2018) (alterations and quotation marks omitted).

Under NEPA, agencies must prepare "detailed" environmental impact statements for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). But not all federal actions fall into that category. An agency may preliminarily prepare an environmental assessment to determine whether the more rigorous environmental impact statement is required. *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1322 (D.C. Cir. 2015) (citing 40 C.F.R. §§ 1501.4, 1508.9). An environmental assessment "[b]riefly provide[s]

sufficient evidence and analysis for determining whether to prepare an environmental impact statement." 40 C.F.R. § 1508.9(a)(1). That analysis must include a discussion of "the environmental impacts of the proposed action and alternatives." *Id.* § 1508.9(b). If, based on the environmental assessment, the agency determines that the proposed action "will not have a significant effect on the human environment," it need not prepare an environmental impact statement. *Id.* § 1508.13. Instead, the agency can issue a formal "finding of no significant impact." *Id.*

## B.

Tennessee Gas Pipeline Co. operates an approximately 11,000-mile interstate natural gas pipeline system that traverses much of the eastern half of the United States. In late 2018, Tennessee Gas sought the Commission's approval for a modest expansion of that system. The expansion, which the parties refer to as the Upgrade Project, involves the addition of 2.1 miles of pipeline and a new compressor station to Tennessee Gas's existing facilities in Agawam, Massachusetts.

As required by the Natural Gas Act, Tennessee Gas applied for a Section 7 certificate for the Upgrade Project. According to the application, the Upgrade Project would serve three purposes. First, it would increase the system's transportation capacity by 72,400 dekatherms per day, helping Tennessee Gas to meet the demand of downstream local distributors. At the time of the application, more than half of the gas the pipeline would carry was already under contract with Columbia Gas of Massachusetts (40,400 dekatherms per day) and Holyoke Gas and Electric Department (5,000 dekatherms per day). Second, the Upgrade Project would improve the reliability of Tennessee Gas's service. And third,

5

the new compressor station would enable Tennessee Gas to retire two older, less-efficient compressor units.

In May 2019, in accordance with NEPA, the Commission completed its Environmental Assessment of the Upgrade Project. The Assessment determined that, with appropriate mitigation measures, the Upgrade Project would not constitute a major federal action significantly affecting the environment. In December 2019, the Commission issued a Certificate Order approving the project. Order Issuing Certificate, *Tennessee Gas Pipeline Co., L.L.C.*, 169 FERC ¶ 61,230 (Dec. 19, 2019) (Certificate Order). The Certificate Order adopted the Environmental Assessment's conclusion and made a formal finding that the Upgrade Project would have no significant environmental impact. Commissioner Glick filed a partial dissent, taking issue with the Commission's treatment of the project's environmental impacts, particularly its climate-change implications.

Petitioners Food & Water Watch and Berkshire filed timely rehearing requests, which the Commission denied in a February 2020 Rehearing Order. Order Denying Rehearing and Stay, *Tennessee Gas Pipeline Co., L.L.C.*, 170 FERC ¶ 61,142 (Feb. 21, 2020). The Commission reaffirmed its approval of the Upgrade Project and defended its assessment of the environmental impacts. Commissioner Glick reiterated his partial dissent.

Food & Water Watch and Berkshire then jointly petitioned our court for review of the Certificate Order and the Rehearing Order.

II.

We begin by examining our jurisdiction to consider the claims presented in the joint petition for review. Two jurisdictional requirements are relevant here: (i) Article III standing, and (ii) statutory subject-matter jurisdiction under the Natural Gas Act. As to the first, while Food & Water Watch has established its standing, Berkshire has not. As to the second, in view of Berkshire's lack of standing, we have jurisdiction to review only those issues that Food & Water Watch adequately preserved before the Commission.

A.

Although the Commission does not challenge either petitioner's standing, "it is well established that the court has an independent obligation to assure that standing exists." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). To establish standing under Article III of the Constitution, a party must demonstrate (i) an injury in fact, (ii) that is fairly traceable to the challenged conduct, and (iii) that is likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). An association like Food & Water Watch or Berkshire has standing only if "(1) at least one of its members would have standing to sue in [its] own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires that an individual member of the association participate in the lawsuit." *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002).

Plainly, the claims brought by Food & Water Watch and Berkshire are germane to both associations' purposes of environmental protection. And "the relief sought under the Administrative Procedure Act does not require the

participation of individual members." *Sierra Club v. FERC*, 827 F.3d 36, 43 (D.C. Cir. 2016) [*Sierra Club*]. The question of individual-member standing is thus "where the rub is." *Id.* Petitioning associations may seek to make the requisite showing through affidavits from members, and both have attempted to do so here. *Sierra Club v. FERC*, 867 F.3d 1357, 1365 (D.C. Cir. 2017) [*Sabal Trail*].

Food & Water Watch has met its burden to show that at least one of its members would have individual standing to sue. First, its members' affidavits identify harms to "concrete aesthetic and recreational interests." *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013). Linda Grimaldi, whose property is near the site of the Upgrade Project's proposed compressor station, provides the clearest example. She explains that the proposed construction would increase noise and pollution at her home, impairing the financial value of her property and her peaceful enjoyment of it. Those sorts of harms satisfy Article III's injury-in-fact requirement. *See, e.g.*, *Sabal Trail*, 867 F.3d at 1365–66; *Sierra Club*, 827 F.3d at 44.

Grimaldi's affidavit similarly makes the second and third required showings to demonstrate her individual standing: causation and redressability. Her injuries are "linked directly to the Commission's authorization[]" of the Upgrade Project, and a reversal of that authorization would provide her redress. *Sierra Club*, 827 F.3d at 44; *see also WildEarth Guardians*, 738 F.3d at 305–06.

Not so for Berkshire's lone affidavit, provided by Jane Winn. Winn, unlike Grimaldi, lives more than 60 miles from the compressor station. Her asserted injury stems from her family's visits to the Six Flags New England amusement park in Agawam, adjacent to the Upgrade Project. According to

Winn, she appreciates the scenic views from the top of rides at Six Flags and otherwise enjoys recreating in the area. And Winn maintains that those interests would be impaired by the noise and pollution associated with the proposed construction, as well as the possibility that the pipeline, once operational, might explode. Be that as it may, to satisfy Article III, an injury not only must be concrete, but also must be "actual or imminent." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Winn's affidavit, though, identifies no specific plans to visit Six Flags and gives no indication of how often she goes to the area. The inference we are left to draw is that she will visit Six Flags at some point in the future. But "[s]uch 'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be— do not support a finding of the 'actual or imminent' injury that our cases require." *Lujan*, 504 U.S. at 564. As a result, Winn's asserted injuries are not sufficiently imminent to demonstrate her standing. And because her affidavit is the only one Berkshire submitted, we find that Berkshire fails to establish its standing.

B.

Berkshire and Food & Water Watch filed a joint petition for review. "[W]hen multiple petitioners bring claims jointly, only one petitioner needs standing to raise each claim." *City of Bos. Delegation*, 897 F.3d at 250. While Berkshire's lack of standing thus presents no obstacle to our considering petitioners' joint claims as a matter of Article III standing, it poses a different jurisdictional impediment to our considering some of the claims.

Our jurisdiction is also constrained by the Natural Gas Act. And for this court to have statutory jurisdiction under that Act "to consider an issue, the party seeking review must have

presented the same issue to the Commission in an application for rehearing." *Id.* (citing 15 U.S.C. § 717r(b)). "Parties seeking review of FERC orders must petition for rehearing of those orders and must *themselves* raise in that petition *all* of the objections urged on appeal." *Platte River Whooping Crane Critical Habitat Maint. Tr. v. FERC*, 876 F.2d 109, 113 (D.C. Cir. 1989) (citing Federal Power Act's identical jurisdictional provision, 16 U.S.C. § 825*l*(b)). Filing a joint petition for review does not permit an end-run around the party-specific nature of the exhaustion requirement. Rather, to determine the issues that a particular party can properly raise before us, we must look to that party's filings before the Commission.

Here, Food & Water Watch and Berkshire filed separate requests for rehearing before the Commission, and those requests were not coextensive. Berkshire identified issues that Food & Water Watch did not, and vice versa. Because Berkshire lacks standing, we lack jurisdiction over the two claims now raised in petitioners' joint brief that Berkshire alone identified before the Commission: that the Commission failed to adequately consider public-health consequences of methane emissions from the Upgrade Project, and that the Commission failed to address the public safety concerns stemming from then-recent explosions on Columbia Gas's distribution system in Massachusetts. We have jurisdiction to consider petitioners' remaining claims.

## III.

We review NEPA claims under the Administrative Procedure Act's familiar arbitrary-or-capricious standard. *Nevada v. U.S. Dep't of Energy*, 457 F.3d 78, 87 (D.C. Cir. 2006). Our mandate in evaluating NEPA claims "is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is

not arbitrary or capricious." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 97–98 (1983). In fulfilling that mandate, we "appl[y] a 'rule of reason,'" and have "refused to 'flyspeck' the agency's findings in search of 'any deficiency no matter how minor.'" *Myersville*, 783 F.3d at 1322–23 (quoting *Nevada*, 457 F.3d at 93).

Food & Water Watch contends the Commission failed to comply with NEPA in four ways. We agree with Food & Water Watch as to one of its arguments but reject the others. And although we remand to the Commission in light of its failure to satisfy its NEPA obligations in one respect, we conclude that vacatur of its order is unwarranted in the circumstances.

A.

If approved, the Upgrade Project would form part of—and add transportation capacity to—a broader natural gas supply chain connecting producers to consumers. *See Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 834 (D.C. Cir. 2006). The natural gas that travels through the Upgrade Project will have come from a production site for ultimate delivery to consumers. Food & Water Watch contends that the Commission violated NEPA by declining to consider the impact of the Upgrade Project's added transportation capacity on upstream production and downstream consumption of natural gas.

NEPA requires agencies to "consider not only the direct effects, but also the *indirect* environmental effects" of proposed actions. *Sabal Trail*, 867 F.3d at 1371. Indirect effects are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b). Effects are "reasonably foreseeable" if they are "sufficiently likely to occur that a person of ordinary

prudence would take [them] into account in reaching a decision." *EarthReports, Inc. v. FERC*, 828 F.3d 949, 955 (D.C. Cir. 2016) (citation omitted).

In requiring evaluation of indirect effects, "the statute does not demand forecasting that is not meaningfully possible, [but] an agency must fulfill its duties to the fullest extent possible." *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1310 (D.C. Cir. 2014) (quotation marks omitted). In the pipeline-approval context, as elsewhere, reasonable forecasting requires information. But an initial lack of information does not afford an agency carte blanche to disregard indirect effects. Rather, we have recently reiterated that, before the Commission may conclude that forecasting indirect effects is not meaningfully possible, "NEPA also requires the Commission to at least *attempt* to obtain the information necessary to fulfill its statutory responsibilities." *See Birckhead v. FERC*, 925 F.3d 510, 520 (D.C. Cir. 2019) (per curiam).

NEPA, then, imposes two, related obligations on the Commission in connection with assessing a proposed pipeline project's indirect effects. First, the Commission must attempt to gather the information necessary to assess the project's potential indirect effects. Second, on the record before it—as supplemented by its own efforts to gather information—the agency must consider the reasonably foreseeable effects of the proposed project.

1.

"Heeding a famous and sensible instruction"—and, now, the wisdom of precedent—"we '[b]egin at the beginning' of the pipeline, with the challenge to the Commission's failure to consider the impacts of upstream gas production." *Id.* at 517 (quoting Lewis Carroll, *Alice's Adventures in Wonderland* 142

(Edmund R. Brown ed., International Pocket Library 1936) (1865)).

In its Certificate Order, the Commission explained that, because the "specific source of natural gas to be transported via the . . . Upgrade Project has not been identified with any precision and will likely change throughout the project's operation," any environmental effects of upstream natural gas production were neither "caused by [the] proposed pipeline project" nor "reasonably foreseeable consequences" of approval. Certificate Order ¶ 61. The Commission indicated that finding causation would require "evidence demonstrating that, absent approval of the project, this gas would not be brought to market by other means." *Id.* ¶ 62. And finding that effects were reasonably foreseeable would require "evidence in the record that would help predict the number and location of any additional wells that would be drilled as a result of any production demand associated with the project." *Id.* The Commission did not attempt to gather the information that it characterized as necessary to assess upstream indirect effects.

In its request for rehearing, Food & Water Watch contested the propriety of the Commission's conclusion but failed to identify any particular flaws in the Commission's approach to upstream effects. The request for rehearing merely reiterated the Commission's NEPA obligation to assess indirect effects and contended that those effects included "upstream fossil fuel extraction." J.A. 463. Before our court, Food & Water Watch attempts to remedy that deficiency, but its effort comes too late.

First, Food & Water Watch contends that the Commission shirked its obligation to gather information necessary to forecast increases in upstream drilling. But the Commission's record-development obligation—like other grounds for

relief—needs to have been invoked before the Commission to be relied upon in court. *Birckhead*, 925 F.3d at 520. Although we, like the *Birckhead* court, are "troubled" by the Commission's failure to seek out relevant information, *id.* at 519, we, again as in *Birckhead*, lack jurisdiction to consider the claim.

Second, Food & Water Watch appears to take issue with evidence the Commission identified as necessary for substantiating foreseeable consequences. In particular, Food & Water Watch contends that the Commission's focus on the location and number of wellheads resulting from the project was too demanding, so as to sidestep the Commission's NEPA obligation to engage in "reasonable forecasting." *See Del. Riverkeeper*, 753 F.3d at 1310 (alteration omitted). On rehearing before the Commission, however, Food & Water Watch failed to argue that the Commission's focus on additional wellheads was misplaced. Such an argument, at best, could be seen to fall implicitly within Food & Water Watch's broader request for the Commission to consider upstream effects. But under the statute's exhaustion requirement, 15 U.S.C. § 717r(b), "[p]etitioners must raise each argument with specificity; objections may not be preserved either indirectly or implicitly." *Ameren Servs. Co. v. FERC*, 893 F.3d 786, 793 (D.C. Cir. 2018) (referring to the Federal Power Act's identical provision) (citations and quotation marks omitted). We thus have no occasion to determine whether the Commission's approach was inconsistent with its NEPA obligations.

Having found Food & Water Watch's upstream-effects arguments jurisdictionally barred, we are left with no basis for concluding that the Commission acted arbitrarily or capriciously, or otherwise violated NEPA, by declining to assess the upstream consequences of the Upgrade Project.

2.

Food & Water Watch's second indirect-effects argument relates to the pipeline's other terminus—the end user. As in the upstream-production context, the Commission determined that the relevant effects—here, downstream gas consumption and the resulting greenhouse-gas emissions—were not reasonably foreseeable. Unlike in the upstream-production context, however, the Commission "attempt[ed] to obtain the information necessary to" determine the scope of its NEPA obligations. *Birckhead*, 925 F.3d at 520 (emphasis removed). Specifically, the Commission issued two data requests to Tennessee Gas to determine the intended downstream use of the transported gas. In response, Tennessee Gas indicated that most of the project's additional capacity would be used to provide service to support Columbia Gas's existing residential and commercial connections in the Greater Springfield service territory. *See* Certificate Order at ¶ 64; *see also* Rehearing Order ¶ 20. After receiving Tennessee Gas's responses, the Commission deemed the information too "generalized" to "render the emissions associated with any consumption of the gas to be transported a reasonably foreseeable indirect effect of the project." Rehearing Order ¶ 20. We conclude that the Commission's explanation was unreasonable.

Before explaining that conclusion, we first address the Commission's view that we lack jurisdiction to reach it. The Commission maintains that Food & Water Watch failed to argue on rehearing before the agency that the record contained sufficient information to estimate downstream impacts. We disagree. In its rehearing request, Food & Water Watch contended that, under our court's precedents, NEPA required the Commission to consider the effects of downstream consumption. Unlike its inadequately preserved argument as

to the estimation of upstream effects, Food & Water Watch's treatment of downstream effects went beyond mere conclusory assertions.

The request's background section summarized the information that Food & Water Watch now argues was sufficient to render downstream combustion foreseeable. The request then cited our precedents, including *Sabal Trail*, requiring the Commission to consider whether a pipeline project will result in reasonably foreseeable downstream greenhouse gas emissions. And the request specifically relied on the dissenting opinion of Commissioner Glick, who made the same argument about the foreseeability of downstream effects. Food & Water Watch concluded the relevant discussion by arguing that the Commission's "overly narrow" assessment of indirect effects disregarded the pipeline's purpose of facilitating natural gas consumption. J.A. 468. Putting all of that together, we conclude that Food & Water Watch raised the issue and "alerted the Commission to the legal argument[]" it now makes before us. *Save Our Sebasticook v. FERC*, 431 F.3d 379, 381 (D.C. Cir. 2005).

On the merits, Food & Water Watch makes no claim that the Commission should have further developed the record. The question before us is thus whether, given the information available to it, the Commission reasonably declined to assess downstream consumption effects. Our precedents establish that downstream emissions are not, "as a categorical matter, always a reasonably foreseeable indirect effect of a pipeline project." *Birckhead*, 925 F.3d at 519. Rather, foreseeability depends on information about the "destination and end use of the gas in question." *Id.*

In *Sabal Trail*, for example, we held that downstream greenhouse-gas emissions were a reasonably foreseeable

indirect effect of a pipeline project designed to transport gas to certain Florida power plants. 867 F.3d at 1374. At the time of approval, two Florida utilities had "already committed to buying nearly all the gas the project will be able to transport" and planned to send that gas to previously identified plants. *Id.* at 1364, 1371. In *Birckhead*, by contrast, we rejected a similar indirect-effects claim when the Commission could establish only that "the gas [was] headed somewhere in the Southeast." 925 F.3d at 518. Taking the record as it stood, we explained that we had "no basis for concluding that the Commission acted unreasonably in declining to evaluate downstream combustion impacts." *Id.* at 520–21.

The record in this case much more closely resembles the information available in *Sabal Trail* than in *Birckhead*. The Commission had evidence that the Upgrade Project would add incremental capacity of 72,400 dekatherms per day to Tennessee Gas's system, 40,400 dekatherms per day of which was under contract with Columbia Gas. And, for that portion of the capacity under contract, the Commission knew, with a good deal of specificity, where the gas in question would be going (to Columbia Gas's existing customers in the Greater Springfield area) and how it would be used (to fuel residential and commercial gas connections). Commissioner Glick articulated precisely that view in his dissenting opinion, arguing that the record made "this a relatively easy case." Rehearing Order ¶ 8 (Glick, Comm'r, dissenting). The Commission stated that the information was too "generalized" but failed to explain that conclusion. Rehearing Order ¶ 20. In the absence of any such explanation, our decision in *Sabal Trail* points the way to concluding that the available information was sufficiently specific to render downstream emissions reasonably foreseeable.

Before our court, the Commission offers two new reasons to doubt the foreseeability of downstream emissions. For its part, Food & Water Watch does not claim that those rationales are unavailable to the Commission. Assuming without deciding that we can consider the newly proffered arguments, we find them unpersuasive.

First, the Commission attempts to distinguish *Sabal Trail* based on the gas's intended end use. According to the Commission, the gas-fired power plants at issue in *Sabal Trail* "have relatively fixed, foreseeable fuel needs," whereas in this case, "local distribution companies, such as Columbia Gas," face "'extremely variable retail demand.'" Govt. Br. 30–31 (quoting FERC, Energy Primer: A Handbook of Energy Market Basics 122 (2020)). But the source cited by the Commission for that position—the Commission's Energy Primer—provides, at best, equivocal support for it. Elsewhere, the same source contrasts the variability of demand between end uses quite differently: "residential and commercial natural gas use tends to be inelastic—consumers use what they need regardless of the price. Power plant demand, on the other hand, is more price-responsive as natural gas competes with other fuels, especially coal." Energy Primer at 6. Given that the Commission provides no other evidence for its position, it has not done enough to show that a difference in foreseeability follows from the distinction between end uses. On remand, the Commission remains free to consider whether there is a reasonable end-use distinction based on additional evidence, but it has not carried its burden before us at this stage.

Second, the Commission contends that, in the local distribution context, it is difficult to assess whether increased capacity will result in increased end-use consumption. But when it comes to foreseeability, the net-effect of a project on consumption is a "total non-sequitur." *Birckhead*, 925 F.3d at

518. In *Birckhead*, we found that "the Commission is wrong to suggest that downstream emissions are not reasonably foreseeable simply because the gas transported by the Project may displace existing natural gas supplies or higher-emitting fuels." *Id.* at 518. Rather, "if downstream greenhouse-gas emissions otherwise qualify as an indirect effect, the mere possibility that a project's overall emissions calculation will be favorable because of an 'offset . . . elsewhere' does not 'excuse[]' the Commission 'from making emissions estimates' in the first place." *Id.* at 518–19 (quoting *Sabal Trail*, 867 F.3d at 1374–75). The same logic squarely applies here as well. We have concluded that the end use of the transported gas is reasonably foreseeable, and the Commission, in response, invokes nothing more than a mere possibility of offsetting reductions.

For those reasons, we remand to the agency to perform a supplemental environmental assessment in which it must either quantify and consider the project's downstream carbon emissions or explain in more detail why it cannot do so.

## B.

Food & Water Watch's next challenge concerns the Commission's finding, in its Environmental Assessment, that it could not determine the "significance" of the emissions directly connected to the project. Although Food & Water Watch raised a general objection to the Commission's conclusion on rehearing, it failed to raise the arguments it now puts forward with sufficient specificity. Because its current objections are unavailable to it, we find that Food & Water Watch has provided no reason to doubt the reasonableness of the Commission's approach.

As explained, one primary function of an environmental assessment is to "provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9(a)(1). It follows, then, that determining the "significance" of expected environmental impacts of an action is an integral part of an environmental assessment.

But here, in the Environmental Assessment's cumulative impacts section, the Commission concluded that it was "unable to determine the significance of the Project's contribution to climate change." J.A. 254. The problem is not, as in the indirect-effects context, that the Commission declined to quantify emissions: the Commission quantified the greenhouse-gas emissions stemming from the construction and operation of the Upgrade Project. The difficulty instead arose at the next step: attributing impacts to that quantity of emissions. The Commission observed that "there is no universally accepted methodology to attribute discrete, quantifiable, physical effects on the environment" to the Upgrade Project's emissions. J.A. 253. In reaching that conclusion, the Commission reviewed various models, none of which met its requirements. "Absent such a method," the Commission reasoned, no assessment of significance was possible. J.A. 254.

In its brief, Food & Water Watch levies multiple criticisms of the Commission's approach. To start, Food & Water Watch targets the Commission's selection criteria, arguing that universal acceptance is an unreasonably exacting standard. Once again, however, Food & Water Watch's argument runs afoul of the Natural Gas Act's exhaustion requirement. Before the Commission, Food & Water Watch did not make that argument. The extent of its objection on rehearing was to the effect that NEPA requires the Commission to consider "the

significance of the harm from a pipeline's contribution to climate change by evaluating the *actual magnitude* of the pipeline's environmental impact." J.A. 464. But simply reiterating the Commission's NEPA obligations did not "alert[] the Commission" to the specific argument that Food & Water Watch now makes. *Save Our Sebasticook*, 431 F.3d at 381. We thus lack jurisdiction to consider that argument.

Next, in its reply brief, Food & Water Watch joins amicus Institute for Policy Integrity in pointing to the Social Cost of Carbon as a potential tool for attributing impacts to quantities of greenhouse-gas emissions. The Commission did not explicitly consider using the Social Cost of Carbon, but that was for good reason: Food & Water Watch failed to identify that method on rehearing before the agency. Food & Water Watch thus again runs afoul of the Natural Gas Act's exhaustion requirement. And amici are powerless to revive an argument the parties failed to preserve. *See Eldred v. Reno*, 239 F.3d 372, 378 (D.C. Cir. 2001).

We are then left with Food & Water Watch's bare assertion that the Commission should have further assessed the significance of climate impacts. But that assertion, unsupported by a validly raised criticism of the Commission's reasoning or any workable alternative method, affords no basis to overturn the Commission's finding. Although Food & Water Watch "take[s] a different position" than the Commission, it has "identif[ied] no method" that "the Commission could have used." *EarthReports*, 828 F.3d at 956. "Hence, petitioner[] provide[s] no reason to doubt the reasonableness of the Commission's conclusion." *Id.*

21

C.

Food & Water Watch last contends that the Commission improperly segmented its NEPA analysis of the Upgrade Project from its analysis of a nearby project, the Longmeadow Meter Station (Longmeadow Project). Because Food & Water Watch made that argument before the Commission, we have jurisdiction to consider it. On the merits, though, we find that the Commission acted reasonably in conducting a separate analysis for the Upgrade Project.

The Longmeadow Project involves construction of a natural gas meter station on Tennessee Gas's interstate pipeline system in Longmeadow, Massachusetts, a town on the opposite side of the Connecticut River from the Upgrade Project. In addition to the new metering station, the Longmeadow Project includes a new pipeline connecting Tennessee Gas's interstate transmission system to Columbia Gas's local distribution system. At one point, the Upgrade Project and Longmeadow Project, along with various other projects, were part of an application for a much larger regional project—the Northeast Energy Direct Project. After that certificate was withdrawn, Tennessee Gas went forward with the Longmeadow Project, ultimately constructing it under a separate "blanket certificate" authority. Certificate Order ¶ 7 n.7. At various stages of the approval process for the Upgrade Project, Food & Water Watch (and other participants) expressed the view that the Upgrade Project and the Longmeadow Project should be considered together.

The regulations implementing NEPA require agencies to consider "connected actions," "cumulative actions," and "similar actions" in a single environmental assessment. 40 C.F.R. § 1508.25(a). "An agency impermissibly 'segments' NEPA review when it divides connected, cumulative, or

similar federal actions into separate projects and thereby fails to address the true scope and impact of the activities that should be under consideration." *Del. Riverkeeper Network*, 753 F.3d at 1313. "The rule ensures that an agency considers the full environmental impact of 'connected, cumulative, or similar' actions before they are undertaken, so that it can assess the true costs of an integrated project when it is best situated to evaluate 'different courses of action' and mitigate anticipated effects." *City of Bos. Delegation*, 897 F.3d at 251–52 (quoting *Del. Riverkeeper Network*, 753 F.3d at 1313–14).

We have developed "a set of factors that help clarify" when natural gas infrastructure projects—which frequently involve some degree of interconnection with other projects in the area—may be considered separately under NEPA. *Id.* at 252. In particular, we have focused on the projects' degree of physical and functional interdependence, *Del. Riverkeeper.* 753 F.3d at 1316, and their temporal overlap, *id.* at 1318. Applying those criteria in *Delaware Riverkeeper*, for example, we granted a petition for review in light of a "clear physical, functional, and temporal nexus between [] projects" that the Commission had considered separately. *Id.* at 1308.

Applying the same two criteria here, we reach the opposite conclusion. The Commission reasonably determined that the Upgrade Project and the Longmeadow Project were amenable to separate NEPA analyses.

First, the Commission reasonably determined that the projects have independent utility—i.e., that "one project will serve a significant purpose even if a second related project is not built." *Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 69 (D.C. Cir. 1987). The Commission found that each project would have gone forward absent the other. Certificate Order ¶ 82. The projects' benefits were entirely different from

each other: "The primary utility of the Longmeadow Meter Station is to enhance reliability and redundancy for [Columbia's] customers, whereas a primary purpose of the [] Upgrade Project is to provide additional transportation service to the project's shippers." *Id.* And the Commission relatedly found that the projects would benefit different sets of customers: the Longmeadow Station aims to benefit customers east of the Connecticut River and the Upgrade Project aims to provide capacity to customers to the west. In *Delaware Riverkeeper*, by contrast, we concluded that there were "no 'Northeast Project customers' as such," because the pipelines were "inextricably intertwined" with the other, related projects. 753 F.3d at 1317.

The second factor—temporal nexus—may be more equivocal if considered in isolation, but it does not undermine the functional independence of the projects. Columbia Gas requested that the Longmeadow meter station be operational by November 2019, whereas the Upgrade Project was anticipated to be placed in service in November 2020. The projects thus proceeded near in time to one another, but ultimately on "separate timeline[s]." Certificate Order ¶ 81. And the separateness of the timelines corresponds with the functional separateness of the projects. In the circumstances, the Commission could reasonably decide to conduct separate NEPA analyses.

## D.

Because the Commission inadequately examined downstream effects, we must remand the matter to the agency. We do so, however, without vacating the Commission's Certificate Order and Rehearing Order.

"The decision to vacate depends on two factors: the likelihood that 'deficiencies' in an order can be redressed on remand, even if the agency reaches the same result, and the 'disruptive consequences' of vacatur." *Black Oak Energy, LLC v. FERC*, 725 F.3d 230, 244 (D.C. Cir. 2013) (quoting *Allied–Signal v. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)). Regarding the first factor, "[w]hen an agency bypasses a fundamental procedural step, the vacatur inquiry asks not whether the ultimate action could be justified, but whether the agency could, with further explanation, justify its decision to skip that procedural step." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1052 (D.C. Cir. 2021). Here, the Commission's environmental assessment produced a finding that the Upgrade Project would have no significant effect on the environment, and on that basis, the Commission bypassed NEPA's requirement to perform a more rigorous environmental impact statement. But after adequately accounting for foreseeable downstream greenhouse-gas emissions, the Commission could arrive at the same finding of no significant impact. And as for the second factor, the Upgrade Project is now either mid-construction or operational. In either case, vacating the Commission's orders would be "quite disruptive." *City of Oberlin, Ohio v. FERC*, 937 F.3d 599, 611 (D.C. Cir. 2019). As a result, we exercise our discretion to remand without vacatur.

\* \* \* \* \*

For the foregoing reasons, we grant Food & Water Watch's petition for review in part. The orders under review are remanded to the Commission for further proceedings consistent with this opinion.

*So ordered.*