# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued April 19, 2016          Decided July 15, 2016

No. 15-1127

EARTHREPORTS, INC., DOING BUSINESS AS PATUXENT
RIVERKEEPER, ET AL.,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

DOMINION COVE POINT LNG, LP, ET AL.,
INTERVENORS

---

On Petition for Review of Orders of
the Federal Energy Regulatory Commission

---

*Deborah Goldberg* argued the cause for petitioner
EarthReports, Inc., et al. With her on the briefs were *Moneen
Nasmith* and *Anne Havemann*.

*Hope M. Babcock*, *Daniel H. Lutz*, and *Sarah J. Fox* were
on the brief for *amici curiae* Waterkeepers Chesapeake, et al. in
support of petitioners EarthReports, Inc., et al.

*Karin L. Larson*, Attorney, Federal Energy Regulatory
Commission, argued the cause for respondent. With her on the
brief were *Robert H. Solomon*, Solicitor, and *Susanna Y. Chu*,

Attorney. *Lisa B. Luftig*, Attorney, entered an appearance.

*Catherine E. Stetson* argued the cause for intervenors Dominion Cove Point LNG, LP and Statoil Natural Gas, LLC. With her on the brief were *J. Patrick Nevins*, *Sean Marotta*, and *Kirstin E. Gibbs*. *Christopher M. Heywood* entered an appearance.

*Ben Norris* argued the cause for respondent-intervenor American Petroleum Institute. With him on the brief were *John Longstreth*, *David L. Wochner*, and *Stacy Linden*.

Before: ROGERS, GRIFFITH and KAVANAUGH, *Circuit Judges*.

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: Several environmental organizations petition for review of the Federal Energy Regulatory Commission's conditional authorization of the conversion of the Cove Point liquefied natural gas ("LNG") facility from an import maritime terminal to a mixed-use, import and export terminal. Petitioners contend that the Commission failed to consider several possible environmental impacts that the Cove Point conversion project may have, and thus did not satisfy its obligations under the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321 *et seq.* We deny the petition. For the reasons set forth in *Sierra Club v. FERC (Freeport)*, No. 14-1275, 2016 WL 3524262 (D.C. Cir. June 28, 2016), the Commission was not required under NEPA to consider indirect effects of increased natural gas exports through the Cove Point facility, including climate impacts. Petitioners' remaining challenges — to the Commission's NEPA analysis of the impacts of ballast water on water quality, maritime traffic on the North Atlantic right whale, and the Cove Point facility's

operations on public safety — fail to show that the Commission did not adequately address these concerns.

**I**.

The Cove Point LNG facility is located in Maryland on the western shore of the Chesapeake Bay. It is owned by Dominion Cove Point LNG, LP. The facility was originally constructed to serve as an import terminal for maritime LNG shipments: Cove Point would receive maritime shipments of LNG, vaporize the LNG into conventional natural gas, and transport it through a dedicated pipeline to facilities in Virginia. From there, the natural gas could be transferred into national pipeline networks for delivery to consumers. Due to changes in market conditions, Cove Point was largely dormant from 1980 until 1994. In 1994, the Commission authorized the reactivation of Cove Point's vaporization and storage facilities and the construction of a liquefaction facility that could turn conventional natural gas into LNG for storage. *See Cove Point LNG Ltd. Partnership*, 68 F.E.R.C. ¶ 61,377 (1994). A further reactivation of Cove Point's import terminal facilities was authorized in 2001, *see Cove Point LNG Ltd. Partnership*, 97 F.E.R.C. ¶ 61,043 (2001), and projects to expand and modernize its facilities were authorized in 2006 and 2009, *see Dominion Cove Point LNG, LP*, 128 F.E.R.C. ¶ 61,037 (2009), *on reh'g*, 129 F.E.R.C. ¶ 61,137 (2009); *Dominion Cove Point LNG, LP*, 115 F.E.R.C. ¶ 61,337 (2006), *on reh'g*, 118 F.E.R.C. ¶ 61,007 (2007).

In April 2013, Dominion filed an application for authorization to convert its Cove Point LNG facility from a facility for maritime LNG imports to a dual-use facility for maritime LNG exports and imports. It sought authorization to construct and operate liquefaction facilities for the export of LNG under section 3 of the Natural Gas Act ("NGA"), 15 U.S.C. § 717b, and pipeline-related compressor facilities for the

transport of the natural gas under NGA § 7, *id*. § 717f. The project called for the construction of an additional liquefaction facility within the Cove Point facility's existing footprint as well as modifications to Cove Point's marine terminal facilities and compressors on its dedicated pipeline in Virginia. The project did not include the addition of any LNG storage tanks or any increase in the size or frequency of LNG marine traffic previously authorized for the Cove Point LNG terminal.

Under the NGA, regulatory oversight for the export of LNG and supporting facilities is divided between the Commission and the Department of Energy ("DOE"). Section 3(a) of the NGA, 15 U.S.C. § 717b(a), bars exportation of any natural gas from the United States to a foreign country without "first having secured an order . . . authorizing it to do so." In 1977, Congress transferred the regulatory functions of NGA § 3 to DOE. *See* 42 U.S.C. § 7151(b). DOE, in turn, delegated to the Commission authority to approve or deny an application for the siting, construction, expansion, or operation of a LNG terminal, 15 U.S.C. § 717b(e), while retaining exclusive authority over the export of natural gas as a commodity, *id.* § 717b(a). *See* DOE Delegation Order No. 00-004.00A (effective May 16, 2006); *see also* 42 U.S.C. § 7172(e). Section 7 of the NGA vests the Commission with authority over the construction and operation of interstate natural gas pipelines and related facilities. *See* 15 U.S.C. § 717f(c)(1)(A); *see also* 42 U.S.C. §§ 7151(b) & 7172(a)(1); *Consol. Edison Co. of N.Y., Inc. v. FERC*, 315 F.3d 316, 319 (D.C. Cir. 2003). Under NGA § 3, an LNG proposal "shall" be authorized unless the proposal "will not be consistent with the public interest[,]" 15 U.S.C. § 717b(a), while under NGA § 7 a finding must be made that a proposal "is or will be required by the present or future public convenience and necessity[,]" *id.* § 717f(e); NGA § 3, unlike § 7, "sets out a general presumption favoring such authorization." *W. Va. Pub. Servs. Comm'n v. Dep't of Energy*, 681 F.2d 847, 856 (D.C. Cir.

1982).

NEPA requires federal agencies to include an environmental impact statement ("EIS") in "every recommendation or report on proposals for . . . major Federal actions significantly affecting the quality of the human environment . . . ." 42 U.S.C. § 4332(2)(C); *see also* 40 C.F.R. § 1508.11. Under regulations promulgated by the Council on Environmental Quality, agencies whose procedures do not require preparation of an EIS must first prepare an environmental assessment. *See* 40 C.F.R. § 1501.4. An environmental assessment "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS][,]" including discussion of "the environmental impacts of the proposed action and alternatives." *Id.* § 1508.9. Such assessments are to include consideration of both "[i]ndirect effects" that are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable," *id*. § 1508.8(b), and the "[c]umulative impact" that "results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions[,]" *id.* § 1508.7. If the agency concludes on the basis of the environmental assessment that an EIS is not required because the proposed actions "will not have a significant effect on the human environment[,]" it must issue a finding of no significant impact ("FONSI") to fulfill NEPA's documentation requirements. *Id.* § 1508.13; *see id.* §§ 1501.4(e) & 1508.9(a)(1); *Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d 852, 857 (D.C. Cir. 2006). Congress has designated the Commission as "the lead agency for the purposes of coordinating all applicable Federal authorizations and for the purposes of complying with [NEPA]." 15 U.S.C. § 717n(b)(1); *see also* 42 U.S.C. § 7172(a)(2).

The Commission devoted almost two years to preparing an environmental assessment of over 200 pages for the Cove Point expansion project. *See* Office of Energy Projects, Fed. Energy Regulatory Comm'n, Environmental Assessment for the Cove Point Liquefaction Project (May 2014) ("Environmental Assessment"). (In June 2012, Dominion had obtained authorization from the Commission to begin pre-filing procedures for a proposed project to convert the Cove Point LNG facility to a dual-use facility so as to obtain timely review and approval of its application.) Commission staff reviewed numerous public comments, including petitioners', and considered the direct, indirect, and cumulative impacts of new liquefaction facilities at Cove Point and the modification of pipeline and related facilities in Virginia. The Environmental Assessment prepared by Commission staff concluded that the Cove Point conversion project "would not constitute a major federal action significantly affecting the quality of the human environment," provided Dominion complied with specific mitigation measures, and recommended that the Commission issue a FONSI. *Id.* at 186–198.

Following another period of public comment, the Commission adopted the Environmental Assessment's findings, issued a FONSI, and conditionally authorized the Cove Point conversion project. *See Dominion Cove Point LNG, LP*, 148 F.E.R.C. ¶ 61,244 at P 281 (2014) ("2014 Authorization Order"). The Commission determined that an EIS was not required because the new facilities would be "within the footprint of the existing LNG terminal," and the environmental issues were "relatively small in number and well-defined." *Id.* ¶ 275. Petitioners, among others, requested rehearing and moved for a stay. On rehearing, the Commission rejected petitioners' challenges to the FONSI and denied requests for a stay as moot. *See Dominion Cove Point LNG, LP*, 151 F.E.R.C. ¶ 61,095 at PP 82, 86 (2015) ("Rehearing Order"). Petitioners

petition for review of the authorization and rehearing orders; the court denied the request for an emergency stay, *see* Order, No. 15-1127 (June 12, 2015).

Meanwhile, the Commission advises, DOE conditionally granted Dominion's request for NGA § 3 authorization to export LNG through Cove Point, in 2011, to countries with which the United States has a free-trade agreement, and in 2013, to non-free trade nations. *See* Resp't's Br. 23. DOE completed its environmental review in 2015 and conditionally approved the exports. *Id.* at 23-24; *see* Office of Fossil Energy, U.S. Dep't of Energy, Opinion and Order Denying Request for Rehearing of Order Granting Long-Term, Multi-Contract Authorization to Export Liquefied Natural Gas by Vessel from the Cove Point LNG Terminal in Calvert County, Maryland, to Non-Free Trade Agreement Nations (Dkt. No. 11-128-LNG) (Apr. 18, 2016) at 4-8.

## II.

Petitioners contend that the Commission, contrary to its NEPA obligations, failed to take a hard look at several possible environmental impacts that could result from the Cove Point conversion project. In their view, the Commission's review should have included the impacts of the increased domestic natural gas production that will result from the exports passing through the converted Cove Point facility, as well as the climate impact of emissions from the production, transport, and consumption of the exported natural gas. In addition, petitioners contend that the Commission failed to adequately consider several direct effects of the conversion project: the impacts of ballast water on water quality, maritime shipping on the North Atlantic right whale, and the modified Cove Point facility's operations on public safety. The Commission responds that it correctly concluded that the former are not within the scope of

NEPA because they are not reasonably foreseeable consequences of the conversion project, and that it adequately addressed the latter.

Our review of the Commission's compliance with NEPA is limited to determining whether its NEPA analysis was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Nat'l Comm. for the New River, Inc. v. FERC*, 373 F.3d 1323, 1327 (D.C. Cir. 2004) (quoting 5 U.S.C. § 706(2)(A)). Review is intended to ensure that the agency "t[ook] a 'hard look' at the environmental consequences before taking a major action[,]" and "adequately considered and disclosed the environmental impact of its actions . . . ." *Balt. Gas & Elec. Co. v. NRDC, Inc.*, 462 U.S. 87, 97-98 (1983). "[A]s long as the agency's decision is fully informed and well-considered, it is entitled to judicial deference and a reviewing court should not substitute its own policy judgment." *NRDC, Inc. v. Hodel*, 865 F.2d 288, 294 (D.C. Cir. 1988) (internal quotation omitted).

## A.

Petitioners' primary contention is that the Commission unlawfully refused to consider the indirect effects that the Cove Point conversion project will have by inducing greater natural gas exports. Such exports, they maintain, will lead to increased U.S. domestic production of natural gas in areas like the Marcellus shale region in the northeast United States, which in turn will lead to increased extraction through hydraulic fracturing, pipeline development, and other activities with a substantial adverse environmental effect. Increased exports, they maintain, will result in additional greenhouse gas emissions from the production, transmission, and consumption of any newly exported natural gas, which in turn will contribute to climate change. The Commission declined to consider upstream domestic natural gas production in its NEPA review because it

was "not sufficiently causally related" to the Cove Point conversion project and was "speculative and not reasonably foreseeable[,]" and concluded "[t]he same principle holds true for potential downstream [greenhouse gas] emissions." 2014 Authorization Order, ¶¶ 228, 246.

Petitioners' contentions here are similar, if not identical, to those addressed in *Sierra Club* (*Freeport*), 2016 WL 3524262. There petitioners also contended that the Commission had failed to give adequate consideration under NEPA to the indirect effects of a different proposed LNG project, which petitioners maintained would facilitate greater LNG exports and thereby induce increased domestic gas production and prompt greater domestic reliance on coal as a fuel source. *See id*. at *6. Looking to *Department of Transportation v. Public Citizen*, 541 U.S. 752 (2004), the court emphasized that the Commission was not required to "examine everything for which the [project] could conceivably be a but-for cause" in order to satisfy NEPA. *Sierra Club (Freeport)*, 2016 WL 3524262, at *6 (citing *Pub. Citizen*, 541 U.S. at 767; *Village of Bensenville v. FAA*, 457 F.3d 52, 65 (D.C. Cir. 2006)). Instead, to warrant consideration under NEPA, an effect had to be "sufficiently likely to occur that a person of ordinary prudence would take it into account in reaching a decision." *Id.* (quoting *City of Shoreacres v. Waterworth*, 420 F.3d 440, 453 (5th Cir. 2005) (quoting *Sierra Club v. Marsh*, 976 F.2d 763, 767 (1st Cir. 1992))). The court held:

> [T]he Commission's NEPA analysis did not have to address the indirect effects of the anticipated *export* of natural gas . . . because [DOE], not the Commission, has sole authority to license the export of any natural gas going through the Freeport facilities. In the specific circumstances where, as here, any agency "has no ability to prevent a certain effect due to" that

agency's "limited statutory authority over the relevant action[]," then that action "cannot be considered a legally relevant 'cause' of the effect" for NEPA purposes.

*Id.* at *7 (quoting *Pub. Citizen*, 541 U.S. at 771). The court reached the same conclusion, citing *Sierra Club (Freeport)*, in the related case of *Sierra Club v. FERC (Sabine Pass)*, No. 14-1249, 2016 WL 3525562 (D.C. Cir. June 28, 2016), and rejected almost identical contentions regarding the indirect effects of increasing a different LNG terminal's production capacity. *See id.* at *5-6. We do so here as well.

Petitioners' contentions regarding the indirect effect of increased exports on upstream natural gas production resemble those rejected in *Sierra Club (Freeport)* and *Sierra Club (Sabine Pass)*. And while those cases did not address whether NEPA reaches the effects of emissions arising from the transport and consumption of exported natural gas, this indirect effect similarly "cannot occur unless a greater volume of [LNG] is shipped from [Cove Point] and enters the international marketplace." *Sierra Club (Sabine Pass)*, 2016 WL 3525562, at *5. Because "[DOE] alone has the legal authority to authorize [Dominion] to increase commodity exports of liquefied natural gas[,]" the challenged orders here too "are not the legally relevant cause of the[se] indirect effects" and "the Commission did not need to consider [them] in its NEPA review." *Id.* As in *Sierra Club (Freeport)* and *Sierra Club (Sabine Pass)*, petitioners "remain[] free to raise these issues in a challenge to the [DOE's] NEPA review of its export decision." *Id.*

One aspect of petitioners' challenge, however, does not stem from increased natural gas exports, namely the Commission's failure to use "social cost of carbon" analysis or a similar analytical tool to analyze the environmental impacts of

greenhouse gas emissions from the construction and operation of the converted Cove Point facilities. The Commission acknowledged the availability of the "social cost of carbon" tool, but, in its opinion concluded that, "it would not be appropriate or informative to use for this project" for three reasons: the lack of consensus on the appropriate discount rate leads to "significant variation in output[,]" the tool "does not measure the actual incremental impacts of a project on the environment[,]" and "there are no established criteria identifying the monetized values that are to be considered significant for NEPA purposes." Rehearing Order, ¶ 54. Petitioners' response, that the Commission should have "present[ed] values calculated with the full range of rates" or "disclosed the limitations of the tool[,]" Pet'rs' Reply Br. 15-16, belies their contention that the Commission acted unreasonably in finding the tool inadequately accurate to warrant inclusion under NEPA. As for using other tools, the Commission observed that "there is no standard methodology to determine how a project's incremental contribution to [greenhouse gas emissions] would result in physical effects on the environment, either locally or globally." 2014 Authorization Order, ¶ 246; *see* Environmental Assessment at 171. Although petitioners take a different position, they identify no method other than the "social cost of carbon" tool that the Commission could have used. Hence, petitioners provide no reason to doubt the reasonableness of the Commission's conclusion. *See WildEarth Guardians v. Jewell*, 738 F.3d 298, 309-12 (D.C. Cir. 2013).

**B.**

Petitioners' remaining challenges to the adequacy of the Commission's NEPA analysis are unpersuasive because, as discussed *infra*, the Commission fulfilled its NEPA obligations by adequately considering petitioners' concerns.

**1.** <u>Ballast Water</u>. Petitioners contend that the Commission "arbitrarily minimized" the impact that the unloading of ballast water by maritime vessels taking on LNG at the Cove Point facility may have on local water quality, particularly through the introduction of foreign invasive species. Pet'rs' Br. 47. The Commission acknowledged these risks and concluded that "the currently-required measures for all ships entering U.S. waters, including offshore ballast water exchange, provide best management practices to minimize risks from invasive species and contamination from non-U.S. ports" and that "new rules and discharge standards approved by the Coast Guard would further minimize" these risks. 2014 Authorization Order, ¶ 128; *see* Rehearing Order, ¶ 72; Environmental Assessment at 53-54.

Petitioners object that the new Coast Guard regulations will not be in effect by the time the conversion project is complete. *See* Pet'rs' Br. 47-48. Citing expert opinion, they note that existing measures are "limited in [] ability to reduce the risk of ballast water invasive species" and that the introduction of such species could pose substantial risks to the local ecosystem as well as the operation of a nearby nuclear power plant. *Id.* at 48 (quoting Letter from Dr. Mario Tamburri, Dir., Mar. Envtl. Research Ctr., Research Professor, Chesapeake Biological Lab. UMCES (June 2, 2014) at 2). The Commission recognized the timeline for implementing the new Coast Guard regulations and concluded that existing measures are adequate, explaining that "[w]hether the regulations are updated in 2016 or at some point in the future, Dominion's operators will be subject to the most recent regulations" and that, particularly as "Maryland does not currently require more stringent standards than the federal ballast water program, the Commission has no grounds to presume the established regulations are not satisfactory . . . ." Rehearing Order, ¶¶ 72-74. The Commission acknowledged Dr. Tamburri's analysis and found unfeasible the onshore ballast water collection and treatment process he recommended because

Dominion "does not own or control the LNG carriers visiting the terminal" and thus cannot "requir[e] adaptations to the vessels to allow for pumping ballast water into an onshore system[,]" among other reasons. 2014 Authorization Order, ¶¶ 126, 130.

Petitioners, in their Reply Brief, criticize an analysis by a Maryland state agency that the Commission cited in authorizing the conversion project for failing to take account of the difference in ballast water effects that vessels receiving as opposed to unloading LNG are likely to have. The Environmental Assessment, however, described that "[d]uring the LNG transfer process, LNG ships would discharge ballast water . . . ." Environmental Assessment at 53. On rehearing, the Commission made clear that it did not rely solely on that state agency's analysis in reaching its conclusion. *See* Rehearing Order, ¶ 72.

To the extent petitioners view the Commission's statement that "[i]t is outside of [its] jurisdiction and expertise to promulgate regulations or invent best management practices regarding ballast water exchange and invasive species control[,]" *id*., ¶ 74, to be an abdication of responsibility, *see* Pet'rs' Br. 49-50, we disagree. Rather, it represents the Commission's reasonable assessment that having "fairly evaluated" possible environmental impacts of ballast water, it had "no grounds" for requiring more stringent conditions than those required by the Coast Guard and the state of Maryland. Rehearing Order, ¶ 74. The cases cited by petitioners are distinguishable because the agencies deferred to another agency's assessment without independently evaluating the relevant impacts. *See Del. Dep't of Nat. Res. & Envtl. Control v. EPA*, 785 F.3d 1, 16 (D.C. Cir. 2015); *New York v. Nuclear Regulatory Comm'n*, 681 F.3d 471, 481 (D.C. Cir. 2012).

**2.** North Atlantic Right Whale. Petitioners also contend that the Commission "refused to analyze," Pet'rs' Br. 50, the possible impact of maritime traffic on the North Atlantic right whale, which petitioners characterize as "so critically endangered that the loss of even one individual could threaten the recovery of the entire population." *Id.* But the Commission acknowledged the threat that maritime traffic can pose to such creatures and concluded that the Cove Point conversion project did not affect those risks because the Commission was not authorizing any maritime traffic over previously authorized levels already addressed by existing mitigation measures. *See* Rehearing Order, ¶¶ 75-78; 2014 Authorization Order, ¶ 142; Environmental Assessment at 71-72.

Petitioners criticize the Commission — as well as the National Oceanic and Atmospheric Administration ("NOAA") with which it consulted — for relying on a 2007 study prepared in connection with prior Cove Point authorizations. They maintain the study is outdated and does not reflect subsequent changes, including maritime traffic and coastal development, and that the Commission should have supplemented the study. On rehearing, the Commission stated its "staff and NOAA, during the informal consultation process, reviewed the previous extensive analyses for past Cove Point projects," namely, the 2006 expansion project and the 2009 pier reenforcement project. Rehearing Order, ¶ 76. They "did not find a significant difference in the type of impacts and available mitigation measures associated with the project that would necessitate a change in the previous determination of effect for the North Atlantic right whale." *Id.* NEPA regulations encourage "tiering" of environmental studies where they address the same subject. *See* 40 C.F.R. § 1502.20. Further, the Commission concluded that its earlier analysis "adequately characterizes the threat of impact on the North Atlantic right whale" from changes in climate and development, and that "in the review of future

threats . . . NOAA will direct appropriate measures to protect the species" with which Dominion would be obligated to comply. Rehearing Order, ¶ 78. Petitioners point to nothing to question the reasonableness of the Commission's conclusion that its earlier analyses sufficiently anticipated the changes they identified and remain adequate to address the risks to the North Atlantic right whale. The Commission, thus, did not act arbitrarily and capriciously in relying on them. *See Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 510-12 (D.C. Cir. 2010).

**3**. Public Safety. Petitioners further contend that the Commission failed to adequately consider several threats to public safety, including the intensity of the impact that a catastrophic incident might have given what petitioners view as an under-sized footprint for the Cove Point facility and its proximity to nearby residences. For its part, the Commission discussed public safety concerns at length and made its conditional authorization subject to several safety-related conditions, including compliance with relevant federal, state, and local requirements and coordinating with relevant agencies. *See* 2014 Authorization Order, ¶¶ 184-217; Rehearing Order, ¶¶ 66-69; Environmental Assessment at 123-59.

Petitioners' primary public safety-related concern is that the Commission failed to adequately account for the fact that the Cove Point facility will handle dangerous chemicals on what petitioners view as a small footprint proximate to residential areas, which they maintain amplifies the possible effects of any safety incident. The Commission acknowledged public safety concerns because "toxic and flammable chemicals would be trucked to and from the facility[,]" "LNG storage tanks . . . are a safety hazard to nearby homes in the event of a . . . rupture[,]" and "the evacuation route is adjacent to the facility[,]" and identified various safety measures addressing each. 2014

Authorization Order, ¶¶ 200, 205-06. The Environmental Assessment included a detailed overview of the facility and its environs, noting the Cove Point facilities would be "situated within a 131-acre area . . . located within an approximately 1,017-acre parcel owned by [Dominion]." Environmental Assessment at 3. Petitioners fail to provide support for their assertion that the disparity between Cove Point's footprint-to-facility ratio and that of other, less densely occupied facilities impacts public safety as would show that the Commission failed adequately to identify and consider public safety issues.

Petitioners object that the Commission's repeated assurances that the Cove Point LNG facility would comply with federal and local standards and coordinate with appropriate authorities constitutes an abdication of its responsibility to conduct an independent public safety evaluation. As evidence, petitioners refer to a September 2014 news article and several affidavits from local residents attached to petitioners' brief to establish Article III standing. But the court's review is limited to the administrative record before the agency at the time of its decision. *See James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1095-96 (D.C. Cir. 1996). Regardless, as noted, the Commission conducted an extensive independent review of safety considerations; the opinions and standards of – and Dominion's future coordination with – federal and local authorities were one reasonable component.

Finally, amici's identification of additional possible environmental impacts they claim were not adequately considered by the Commission are not properly before the court. *See Eldred v. Reno*, 239 F.3d 372, 378 (D.C. Cir. 2001), *aff'd*, *on other grounds*, 537 U.S. 186 (2003); *see also* 16AA Wright, Miller, & Cooper, Federal Practice and Procedure § 3975.1 & n.4 (4th ed. Apr. 2016).

Accordingly, because petitioners fail to show that the Commission's NEPA analysis was deficient for failing to consider indirect effects of the Cove Point conversion project or inadequately considered their remaining concerns and that the Commission thus acted arbitrarily and capriciously, we deny the petition for review.