# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

————

Argued September 24, 2021      Decided August 2, 2022

No. 20-1206

DELAWARE RIVERKEEPER NETWORK AND MAYA VAN
ROSSUM, THE DELAWARE RIVERKEEPER,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

ADELPHIA GATEWAY, LLC,
INTERVENOR

————

Consolidated with 20-1338

————

On Petitions for Review of Orders
of the Federal Energy Regulatory Commission

————

*Kacy C. Manahan* argued the causes for petitioners Delaware Riverkeeper Network, et al. *Douglas R. Blazey* argued the causes for petitioner West Rockhill Township. With them on the joint briefs was *John R. Embick*.

*Jared B. Fish*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on

the brief were *Matthew R. Christiansen*, General Counsel, and *Robert H. Solomon*, Solicitor.

*Jeremy C. Marwell* argued the cause for intervenor. With him on the brief were *James D. Seegers, Suzanne E. Clevenger, Matthew X. Etchemendy,* and *James T. Dawson*.

Before: ROGERS and JACKSON[*], *Circuit Judges*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: Adelphia Gateway, LLC, applied to the Federal Energy Regulatory Commission for a certificate of public convenience and necessity to acquire an existing pipeline system in Pennsylvania and Delaware. It also sought authorization to construct two short lateral pipeline segments extending from the existing pipeline infrastructure it would acquire. One of these, the "Parkway Lateral," would consist of a 0.3-mile lateral to an existing meter station that provides natural gas service to several transmission companies and power plants. Adelphia also sought approval to construct facilities necessary to operate the pipeline, including the Quakertown Compressor Station in Bucks County, Pennsylvania. Together, these acquisitions and improvements would comprise the Adelphia Gateway Project ("the Project").

The Commission conducted an Environmental Assessment analyzing the Project's safety and its effects on air quality, noise, and residential lands near the pipeline. The Commission acknowledged that the Project "would contribute

---

[*] Circuit Judge Jackson, now Justice Jackson, was a member of the panel at the time the case was argued but did not participate in the preparation of this opinion.

to global increases in [greenhouse-gas] levels," but did not calculate "the downstream [greenhouse-gas] emissions of the southern portion of the Project," because "the downstream emissions from the remainder of the southern portion of the Project are not designated to a specific user, and the end use of the natural gas is not identified by Adelphia." Environmental Assessment at 132. The Commission also declined to consider the upstream impacts of the Project on demand for natural gas, which it found to be "outside the scope of this [Environmental Assessment]." *Id.* The Commission considered and rejected several alternatives to the Project, and specifically to the location of the Quakertown Compressor Station. *Id.* at 183–84. The Environmental Assessment concluded that "if Adelphia constructs and operates the proposed facilities in accordance with its application and supplements and [the Commission's] recommended mitigation measures," the project would have "no significant impact" on the environment. *Id.* at 194. Petitioners filed comments with the Commission challenging the adequacy of the Environmental Assessment and Adelphia's application for a certificate.

The Commission issued a certificate of public convenience and necessity for the Project, finding that Adelphia had demonstrated market need for the Project. It relied largely on four precedent agreements Adelphia had entered for the majority of the Project's capacity. It rejected commenters' arguments that there was insufficient demand in the region to support the Project, concluding that commenters had provided "no compelling evidence of overbuilding in the face of compelling evidence of need in the form of substantial customer support." Certificate Order at 15. The Commission concluded that "the benefits that the Adelphia Gateway Project will provide to the market outweigh any adverse effects on existing shippers, other pipelines and their captive customers, and on landowners and surrounding communities." *Id.* at 17.

One member of the Commission dissented. Requests for rehearing and a stay of the Certificate Order were denied, and the Commission reaffirmed its finding of market need, its balancing of adverse impacts and public benefits, and its environmental analysis.

## I.

In their joint brief, petitioners challenge: (1) the Commission's finding of market need for the Project under the Natural Gas Act; (2) the sufficiency of the Commission's environmental review under the National Environmental Policy Act ("NEPA"); and (3) the constitutionality of the Commission's purported preemption of state and local authorities' ability to protect public health. The Court is persuaded that the Commission did not act arbitrarily and capriciously.

This court reviews the Commission's orders, "including those approving certificate applications, under the familiar arbitrary and capricious standard" of the Administrative Procedure Act ("APA"). *Minisink Residents for Env't Pres. & Safety v. FERC*, 762 F.3d 97, 105–06 (D.C. Cir. 2014); *see also* 5 U.S.C. § 706(2)(A). An agency's compliance with NEPA's requirements is also reviewed under the APA's arbitrary and capricious standard. *Sierra Club v. FERC*, 867 F.3d 1357, 1367 (D.C. Cir. 2017) ("*Sabal Trail*"). Thus, with respect to petitioners' challenges under both the Natural Gas Act and NEPA, the question is whether the Commission's Certificate and Rehearing Orders were "based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Minisink*, 762 F.3d at 106 (quoting *ExxonMobil Gas Mktg. Co. v. FERC*, 297 F.3d 1071, 1083 (D.C. Cir. 2002)). The agency's decision must "contain 'sufficient discussion of the relevant issues and opposing viewpoints,'"

*Sabal Trail*, 867 F.3d at 1368 (quoting *Nevada v. Dep't of Energy*, 457 F.3d 78, 93 (D.C. Cir. 2006)), and "demonstrate 'reasoned decisionmaking,'" *id.* (quoting *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014)).

To the extent petitioners challenge the Commission's factual findings, this court reviews those findings to ensure they are supported by substantial evidence in the record. *Myersville Citizens for a Rural Cmty. v. FERC*, 783 F.3d 1301, 1309 (D.C. Cir. 2015).  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *id.* (quoting *Colo. Interstate Gas Co. v. FERC*, 599 F.3d 698, 704 (D.C. Cir. 2010)), and this standard "requires more than a scintilla, but can be satisfied by something less than a preponderance of the evidence," *id.* (quoting *Minisink*, 762 F.3d at 108).

**A.**

NEPA provides that "[a]ny proposed 'major Federal action[] significantly affecting the quality of the human environment' triggers in an agency the obligation to prepare an Environmental Impact Statement . . . discussing in detail the environmental impact of the proposed action, alternatives to the action, and other considerations." *Myersville*, 783 F.3d at 1322 (second alteration in original) (quoting 42 U.S.C. § 4332(C)).  "An agency may preliminarily prepare an Environmental Assessment . . . to determine whether the more rigorous [Environmental Impact Statement] is required." *Id.* An environmental impact statement "is unnecessary if an agency makes a 'finding of no significant impact'" on the human environment, which "discharges the agency's NEPA documentation obligations." *Id.*

Petitioners contend that both the Commission's environmental impact analysis and its analysis of alternatives

to the Project were deficient, resulting in an erroneous finding of no significant impact. Petitioners maintain that the Commission failed to consider (1) upstream effects of increased demand for natural gas; (2) downstream effects of increased natural gas consumption, specifically the resulting greenhouse gas emissions from such consumption; (3) the effects on climate change resulting from downstream greenhouse-gas emissions; (4) the cumulative impact of the Project together with another pipeline project; and (5) the environmental effects of the Quakertown Compressor Station as compared to alternatives. By circumscribing its analysis in these ways, petitioners maintain, the Commission erroneously reached a finding of no significant impact rather than proceeding to conduct a full environmental impact statement.

### i. *Upstream impacts*

Petitioners contend that the Commission failed to consider the possible upstream effects of the Project, particularly drilling new natural gas wells to meet the pipeline's increased capacity. The Commission was required to consider these upstream impacts only if they were reasonably foreseeable. 40 C.F.R. § 1508.1(g). Petitioners point to no evidence undermining the Commission's reasoned conclusion that such impacts were not reasonably foreseeable.

The Commission initially deemed upstream effects on drilling to be "outside the scope" of the environmental assessment stage of project review. Environmental Assessment at 132. In its Certificate Order, the Commission clarified that "the environmental impacts of upstream natural gas production are not an indirect effect of the project" because "the Adelphia Gateway Project will receive gas from other interstate pipelines and there is no evidence that" general information about drilling in the region "would help predict the

number and location of any additional wells that would be drilled as a result of any production demand associated with the project." Certificate Order at 99.

As in *Birckhead v. FERC*, 925 F.3d 510 (D.C. Cir. 2019), petitioners here "have identified no record evidence that would help the Commission predict the number and location of any additional wells that would be drilled as a result of production demand created by the Project." *Id.* at 517. Nor do petitioners point to any evidence that shippers "would not extract and produce [the] gas" even if the Project did not go forward. *Id.* For example, in support of their assertion that upstream increases in natural gas drilling were reasonably foreseeable, petitioners cite a table showing "[a]ctive, proposed, and reported natural gas wells in Pennsylvania." Appendix 1, PennEast Well Drilling Impacts. But petitioners do not explain how that location data supports an inference that *more* wells will be needed to support increased demand spurred by the Project. And as in *Birckhead*, petitioners "nowhere claim that the Commission's failure to seek out additional information [regarding upstream effects] constitutes a violation of its obligations under NEPA." 925 F.3d at 518. *Birckhead* governs the analysis and forecloses petitioners' contention that the Commission did not adequately consider upstream effects of the Project.

### ii. *Downstream impacts*

Greenhouse gas emissions are reasonably foreseeable effects of a pipeline project when the project is known to transport natural gas to particular power plants. *Sabal Trail*, 867 F.3d at 1371–74; *accord Birckhead*, 925 F.3d at 518. Nonetheless, there will inevitably be some limits on the foreseeability of emissions, and the court has rejected the notion that downstream emissions are always reasonably

foreseeable effects of a pipeline project. *Birckhead*, 925 F.3d at 518–19. The court "defer[s] to the informed discretion" of the Commission, especially "[w]here an issue requires a high level of technical expertise." *Del. Riverkeeper*, 753 F.3d at 1313.

The Commission analyzed the downstream emissions impacts of much of the natural gas subscribed in Adelphia's four existing precedent agreements. It determined that any other downstream greenhouse gas emissions resulting from the Project — including emissions associated with a precedent agreement to deliver gas on the Zone South system for further transportation on the interstate grid — were not reasonably foreseeable because the Commission was unable to identify the end users of that natural gas. The Commission's reasoning was sound. It explained that natural gas would be delivered for further transportation on the interstate grid to an unknown destination and for an unknown end use. It therefore declined to estimate emissions associated with those volumes of gas. Petitioners maintain that because the vast majority of natural gas is ultimately combusted for use as a fuel source, the Commission should have used the entire volume of gas to be transported on the Project as a basis for estimating emissions — a so-called full-burn analysis. That objection is foreclosed by *Birckhead*, which rejected the contention that "emissions from downstream gas combustion are, as a categorical matter, always a reasonably foreseeable indirect effect of a pipeline project." 925 F.3d at 519. Petitioners also suggest that, even if a full-burn analysis was not required, the Commission should have assumed that "a certain percentage" of natural gas transported on the Project "will be combusted based on industry statistics." Reply Br. 10. That still assumes, contrary to *Birckhead*, that emissions from downstream combustion are categorically reasonably foreseeable and that industry averages can be applied in any and every case. Further, petitioners make

no attempt to "identify [a] method . . . that the Commission could have used," *EarthReports, Inc. v. FERC*, 828 F.3d 949, 956 (D.C. Cir. 2016), to calculate that "certain percentage" based on "industry statistics," Reply Br. 10.

Petitioners argue that if the information available to the Commission was too generalized to permit an estimate of emissions, the Commission should have gathered that information from Project stakeholders. *See Birckhead*, 925 F.3d at 519–20. The Commission did ask Adelphia about the destination and end use of the Zone South capacity subscribed in the fourth precedent agreement. Adelphia informed the Commission that the gas would be delivered for further transportation on the interstate grid for an unknown end use. Certificate Order at 102 & n.550. Petitioners maintain that this exchange did not discharge the Commission's obligation to "at least *attempt* to obtain the information necessary to fulfill [the Commission's] statutory responsibilities." *Birckhead*, 925 F.3d at 520. Petitioners maintain the Commission should have taken the extra step of asking the shipper about the destination and end use of the gas. *See* Pet'rs' Br. 30–31. But petitioners did not raise this argument on rehearing before the Commission, instead arguing that the Commission had sufficiently specific information to analyze the full extent of downstream impacts. Petitioners' one offhand, unsupported comment that the Commission "should have asked for more specifics . . . if the information was too general" did not put the Commission on notice of the position petitioners now take before this court. Pet. for Reh'g at 108. Because this claim was not adequately raised before the Commission, the court lacks jurisdiction to consider it. *See Food & Water Watch v. FERC*, 28 F.4th 277, 286 (D.C. Cir. 2022); *Birckhead*, 925 F.3d at 520.

Petitioners also maintain that, at a minimum, the Commission should have calculated the emissions associated with the Parkway Lateral, a new 0.3-mile segment of pipeline that would connect the existing pipeline with other existing natural gas facilities and infrastructure. Consistent with *Birckhead*, 925 F.3d at 520, the Commission sought further information from Adelphia about the Parkway Lateral, *see* DPC Data Request from Commission to Adelphia (July 12, 2018); Adelphia's Response to DPC Data Request (July 27, 2018), and learned that the Parkway Lateral "may serve Calpine Corporation's power plants," but that "no contract or precedent agreement exists to ascribe any particular capacity to this potential end user," Environmental Assessment at 132 n.39. Contrary to petitioners' suggestion, this case is unlike either *Sabal Trail*, 867 F.3d at 1364, 1371–72, or *Food & Water Watch*, 28 F.4th at 288, as in both cases, precedent agreements provided data as to how much gas would be transported and thus offered a basis for the Commission to estimate emissions. Here, in the absence of any data regarding the "amount of capacity that would serve a power plant," the Commission concluded it could not "reasonably quantify or foresee the [greenhouse-gas] emission impacts" associated with the Parkway Lateral. Reh'g Order at 58. Given the deference owed to the Commission's technical judgments, the court cannot conclude this was unreasonable. *Del. Riverkeeper*, 753 F.3d at 1313.

### iii. Climate change impacts

Under 15 U.S.C. § 717r, courts may not consider an "objection to the order of the Commission . . . unless such objection shall have been urged before the Commission in the application for rehearing." *Id.* § 717r(b). A challenger's rehearing application must "set forth specifically the ground or grounds upon which such application is based." *Id.* § 717r(a).

To satisfy this standard, a party must raise an issue in a petition for rehearing with "sufficient clarity regarding the grounds on which it urged reconsideration," *Belco Petrol. Corp. v. FERC*, 589 F.2d 680, 683 (D.C. Cir. 1978), to "alert the Commission to particular and possibly remediable problems," *R.I. Consumers' Council v. Fed. Power Comm'n*, 504 F.2d 203, 213 (D.C. Cir. 1974).

The Commission concluded that there was "no scientifically-accepted methodology available to correlate specific amounts of [greenhouse-gas] emissions to discrete changes in" the human environment, Environmental Assessment at 172, and rejected the Social Cost of Carbon methodology for assessing climate change impacts, Reh'g Order at 41–42. The Social Cost of Carbon is a tool that quantifies in monetary terms the climate change impact resulting from greenhouse-gas emissions. This court has upheld similar explanations as sufficient to justify the Commission's refusal to use the Social Cost of Carbon tool. *See EarthReports*, 828 F.3d at 956.

Petitioners maintain that a Social Cost of Carbon analysis was required pursuant to 40 C.F.R. § 1502.21(c)(4), which provides that when "information relevant to reasonably foreseeable significant adverse impacts cannot be obtained because . . . the means to obtain it are not known," "the agency shall include within the environmental impact statement . . . [t]he agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community." *Id.* Petitioners contend that the Social Cost of Carbon tool is one such generally accepted methodology. *See* Pet'rs' 28(j) Letter at 1–2 (Aug. 19, 2021) (citing *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321 (D.C. Cir. 2021)).

But they did not argue before the Commission that section 1502.21(c) required the use of the Social Cost of Carbon tool. Their rehearing request referred to the regulation once in a footnote, and only in the context of the version of the argument petitioners then relied on — that the Commission was wrong to reject the Social Cost of Carbon tool on grounds of scientific merit. Reh'g Request at 125. That passing reference was not enough to "alert the Commission" to the position petitioners now take. *R.I. Consumers' Council*, 504 F.2d at 213. On its face, 40 C.F.R. § 1502.21(c) applies only to "environmental impact statements," as opposed to environmental assessments. Petitioners never advanced an explanation why the Commission was required to use this tool in the less demanding environmental assessment context. Because petitioners failed to "set forth specifically [this] ground" before the Commission, 15 U.S.C. § 717r, the court lacks jurisdiction to consider this contention, *see Food & Water Watch*, 28 F.4th at 287, 290.

### iv. PennEast Pipeline

"An agency impermissibly 'segments' NEPA review when it divides connected, cumulative, or similar federal actions into separate projects and thereby fails to address the true scope and impact of the activities that should be under consideration." *Del. Riverkeeper*, 753 F.3d at 1313. Whether actions should be considered as connected turns on "whether one project will serve a significant purpose even if a second related project is not built." *City of Bos. Delegation v. FERC*, 897 F.3d 241, 252 (D.C. Cir. 2018) (quoting *Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 69 (D.C. Cir. 1987)).

Petitioners acknowledge that the PennEast Pipeline Project is now defunct; the Commission vacated the certificates it had issued authorizing that project; and this court granted the Commission's motions to dismiss pending actions related to

that project. Petitioners thus recognize that, in the event of a remand to the Commission, "it is no longer necessary for [the Commission] to consider PennEast in its NEPA analysis." Pet'rs' 28(j) Letter at 2 (Mar. 17, 2022).

The dissolution of the PennEast Pipeline Project has rendered harmless any error in the Commission's failure to consider the two projects as connected actions. The "rule of prejudicial error," 5 U.S.C. § 706, applies "in the NEPA context where the proposing agency engaged in significant environmental analysis before reaching a decision but failed to comply precisely with NEPA procedures." *Nevada*, 457 F.3d at 90. Even assuming the Commission was required to consider the Project and the PennEast Pipeline as connected actions, the Commission's environmental review did not prejudice petitioners because the abandonment of the PennEast project eliminated the possibility that the projects could have a cumulative environmental impact.

### v. *Quakertown Compressor Station and Alternatives*

Petitioners finally contend that the Commission did not adequately consider the environmental effects of construction of the Quakertown Compressor Station as compared to alternative options. Petitioners offer a laundry list of purported deficiencies in the Commission's analysis, but the Commission took a "hard look" at each point raised by petitioners, discharging its obligations under NEPA. *Minisink*, 762 F.3d at 111.

Several of petitioners' concerns regarding the Quakertown Compressor Station revolve around the size of the Quakertown site, particularly as compared to other possible sites for the compressor station. The Commission addressed these concerns in a reasoned manner. It explained that, while there

may have been larger possible sites, there was no hard-and-fast rule regarding the minimum acceptable site size for a compressor station, and that the purported requirements petitioners pointed to in agency guidance documents merely noted the typical acreage for a compressor station, not the minimum required acreage. Certificate Order at 52. The Commission also reasoned that any size advantage, including increased isolation distances to nearby structures, of alternative sites was outweighed by other concerns, including the need for "additional compression, resulting in increased air emissions." Reh'g Order at 21–22. Even if the compressor station were relocated to one of the alternative sites, the Commission pointed out, an above-ground facility would still be needed at the Quakertown site. *Id.*; Environmental Assessment at 184. The Commission did not misstate the sizes of the alternative sites; it observed that the Salford alternative site offered 2.3 "[c]onstruction acres," not 2.3 total acres. Environmental Assessment at 184.

Petitioners raise safety concerns regarding the Quakertown site. But their objections — that the Commission neglected to "consider land use laws" and improperly permitted Adelphia to "rely upon local emergency personnel in the event of an incident," Pet'rs' Br. 40 — are undeveloped and unsupported. The court is unable to discern any basis for rejecting the Commission's safety analysis, which considered applicable federal safety standards, the distance from the compressor station to existing structures and residences, and the mitigation measures to which Adelphia had committed. Likewise, the Commission considered and addressed concerns about noise pollution and air quality impacts.

Petitioners' apprehension regarding the construction of an industrial facility near "historic homes" and "prime farmlands and wetlands," Pet'rs' Br. 41, is understandable. But the

court's role "is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 97–98 (1983). The Commission gave reasoned responses to petitioners' objections that adequately justified its decision not to prepare an Environmental Impact Statement. *See Myersville*, 783 F.3d at 1322.

The court's "role in reviewing an agency's decision not to prepare an [Environmental Impact Statement] is a 'limited' one, 'designed primarily to ensure that no arguably significant consequences have been ignored.'" *Myersville*, 783 F.3d at 1322 (quoting *TOMAC v. Norton*, 433 F.3d 852, 860 (D.C. Cir. 2006)). The Environmental Assessment thoroughly considered the environmental impacts of the Project and reasonably concluded that the Project, which consists mainly of the transfer of ownership of existing pipeline, was not likely to have a significant impact on the environment. The record demonstrates that the Commission was justified in its decision to proceed by Environmental Assessment.

## B.

Petitioners also contend that the Commission's determination of market need for the Project was flawed. Prior to filing its application, Adelphia held an open season in November and December 2017 to solicit potential interest in the pipeline's service. As a result, Adelphia entered into four long-term precedent agreements with natural gas shippers. "Precedent agreements are long-term contracts in which gas shippers agree to buy the proposed pipeline's transportation services." *Allegheny Def. Project v. FERC*, 964 F.3d 1, 19 (D.C. Cir. 2020) (en banc). These agreements accounted for approximately 76% of the Project's total natural gas

transportation capacity. Some of the precedent agreements called for the gas subscribed to be delivered to a known end user; others called for the gas to be transported to interconnections with other interstate pipelines for further transportation on the interstate grid.

Precedent agreements are important, and sometimes sufficient, evidence of market need for a pipeline project. *See Minisink*, 762 F.3d at 111 n.10; *City of Oberlin v. FERC*, 937 F.3d 599, 605–06 (D.C. Cir. 2019). Petitioners nevertheless maintain that the Commission's determination of public need was flawed because the Commission unreasonably relied exclusively on Adelphia's precedent agreements and ignored competing evidence demonstrating there was no market need for the project. In an August 19, 2021 letter, petitioners contend that this court's decision in *Environmental Defense Fund v. FERC*, 2 F.4th 953 (D.C. Cir. 2021) ("*Spire STL*") undermines the Commission's reliance on precedent agreements here. In a March 17, 2022 letter, petitioners argue that the Commission's Updated Policy Statement on Certification of New Interstate Natural Gas Facilities, 178 FERC ¶ 61,107 (2022) ("Updated Certificate Policy Statement") demonstrates the inadequacy of the Commission's reliance on precedent agreements as evidence of market need. Finally, petitioners suggest that the Commission's market need determination failed to account for adverse environmental effects.

First, petitioners' contention that competing evidence of a lack of demand rebutted the existing precedent agreements is misplaced. The court has observed that the Commission is not ordinarily required "to assess a project's benefits by looking beyond the market need reflected by the applicant's existing contracts with shippers." *Minisink*, 762 F.3d at 111 n.10; *see Myersville*, 783 F.3d at 1311; *City of Oberlin*, 937 F.3d at 605–

06. And in any event, the Commission addressed the evidence petitioners point to as demonstrating sufficient existing pipeline capacity, reasonably concluding that concrete obligations to purchase natural gas (as demonstrated by the precedent agreements) were better evidence of market need than the more speculative reports regarding overbuilding and future demand relied on by petitioners.

*Spire STL* does not cast doubt on that analysis. There, the court held that the Commission's finding of market need was arbitrary and capricious in part because "the application was supported by only a single precedent agreement" with a shipper who "was a corporate affiliate of the applicant who was proposing to build the new pipeline." 2 F.4th at 973. That one precedent agreement with an affiliated shipper was questionable evidence of market need, the court held, because that agreement was reached after the pipeline builder held an open season that produced no precedent agreements, *id.*, and because petitioners had "identified plausible evidence of self-dealing," *id.* at 975. Here, by contrast, Adelphia held an open season that produced precedent agreements with four different shippers for the large majority of the pipeline's capacity. And crucially, most of the Project consists of existing pipeline that is merely changing ownership; in that context, the Commission could reasonably conclude that precedent agreements were especially good evidence of demand for the pipeline's capacity.

Nor does the Updated Certificate Policy Statement call into question the Commission's reliance on precedent agreements here. Instead, it simply observes that, whereas the Commission has sometimes relied "almost exclusively on precedent agreements to establish project need" in the past, going forward, the Commission will look to other evidence of project need as well. 178 FERC ¶ 61,107, P 54 (2022). The Commission made clear that it would not apply the Updated

Certificate Policy Statement "to pending applications or applications filed before the Commission issues any final guidance in these dockets," Order on Draft Policy Statements, 178 FERC ¶ 61,197, P 2 (2022). The court has explained that an agency's adoption of a new policy does not render decisions reached under an earlier policy arbitrary and capricious. *Brooklyn Union Gas Co. v. FERC*, 409 F.3d 404, 406 (D.C. Cir. 2005).

Petitioners also contend that the Commission's balancing of "public benefits against the potential adverse consequences" of the Project was deficient. *Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC 61,227, 61,745 (Sept. 15, 1999); *see* Reply Br. 5–7. In petitioners' view, the Commission cannot have adequately balanced the potential "negative impact on the environment or landowners' property," *Myersville*, 783 F.3d at 1309, because the Commission conducted a "deficient NEPA analysis," Pet'rs' Br. 75. Because the court concludes that the Commission's NEPA analysis was adequate, this contention necessarily fails as well; the Commission's balancing of public benefits and adverse consequences reasonably accounted for potential environmental impacts.

## C.

Finally, petitioners contend that under the U.S. Constitution's Fifth, Ninth, and Tenth Amendments, the Commission interpreted the Natural Gas Act in a manner that "unconstitutionally preempt[ed] legitimate state and local action that is necessary and appropriate to protect public health, safety and welfare." Pet'rs' Br. 78. This constitutional claim is forfeited. Petitioners are "required to exhaust" even "constitutional claims" before the agency, *Springsteen-Abbott v. SEC*, 989 F.3d 4, 8 (D.C. Cir. 2021), even if the agency does

not have "the authority to rule on them in the first instance during the agency proceedings," *Jarkesy v. SEC*, 803 F.3d 9, 19 (D.C. Cir. 2015). Because petitioners did not raise any such constitutional argument in requesting rehearing before the Commission, *see* 15 U.S.C. § 717r, the court cannot consider it here.

For the reasons discussed, the petitions for review are denied.