# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 10, 2024          Decided March 28, 2025

No. 23-1226

HEALTHY GULF AND SIERRA CLUB,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

DRIFTWOOD LNG LLC AND DRIFTWOOD PIPELINE LLC,
INTERVENORS

———

On Petition for Review of an Order of the
Federal Energy Regulatory Commission

———

*David Bookbinder* argued the cause and filed the joint briefs for petitioner. *Eric E. Huber*, *Nathan Matthews*, and *Rebecca McCreary* entered appearances.

*J. Houston Shaner*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *Matthew R. Christiansen*, General Counsel, and *Robert H. Solomon*, Solicitor.

*E. Joshua Rosenkranz* argued the cause for intervenors for respondent. With him on the brief were *Robert M. Loeb*, *Geoffrey Shaw*, and *Lisa M. Tonery*.

Before: WILKINS and GARCIA, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GARCIA.

GARCIA, *Circuit Judge*: The Federal Energy Regulatory Commission authorized Driftwood Pipeline LLC to build two new natural gas pipelines in southwestern Louisiana. Environmental groups Healthy Gulf and Sierra Club petition for review of that decision, arguing that FERC failed to comply with certain requirements of the National Environmental Policy Act and the Natural Gas Act. We disagree and deny the petition for review.

**I**

**A**

The Natural Gas Act gives FERC authority to regulate the transportation of natural gas in interstate commerce. 15 U.S.C. § 717(b). To build or operate an interstate natural gas pipeline, an entity must obtain from FERC a "certificate of public convenience and necessity" (known as a Section 7 certificate). *Id.* § 717f(c). FERC shall issue a Section 7 certificate if it determines that the project is "required by the present or future public convenience and necessity." *Id.* § 717f(e). When making that determination, FERC must consider "all factors bearing on the public interest." *Atl. Refin. Co. v. Pub. Serv. Comm'n*, 360 U.S. 378, 391 (1959).

The certificate process also includes review under the National Environmental Policy Act. NEPA requires federal agencies to prepare an environmental impact statement for all

"major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). As part of its NEPA review, an agency must "look hard at the environmental effects of its decisions," *Minisink Residents for Env't Pres. & Safety v. FERC*, 762 F.3d 97, 102 (D.C. Cir. 2014) (cleaned up), and "inform the public" of its findings, *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983). But an agency need not "change the course of action it proposes" to comply with NEPA. *Lemon v. Geren*, 514 F.3d 1312, 1315 (D.C. Cir. 2008).

**B**

In 2021, Driftwood Pipeline LLC sought FERC's approval to build and operate two new natural gas pipelines, Lines 200 and 300, in southwestern Louisiana. The pipelines would run thirty or so miles alongside one another, connecting existing pipeline systems in the north to the Lake Charles gas market. Part of the project would run parallel with another planned Driftwood pipeline, known as the Mainline. Both pipeline systems would end at the same natural gas terminal, the Driftwood Terminal, which is owned and operated by a Driftwood sister company, Driftwood LNG LLC.

In September 2022, FERC published an environmental impact statement for Lines 200 and 300. It concluded that the project "would result in some adverse environmental impacts, but none that are considered significant." J.A. 452. The Commission also acknowledged that the project would increase the concentration of greenhouse gases in the atmosphere but declined to characterize those effects as significant or insignificant.

In April 2023, FERC granted Driftwood Pipeline a Section 7 certificate to build and operate Lines 200 and 300. *Driftwood Pipeline LLC*, 183 FERC ¶ 61,049 (Apr. 21, 2023) (Certificate Order). FERC determined that the project would serve a

demonstrated market need and that this benefit outweighed the project's potential adverse effects, *id.* at P 78, including those identified in the Commission's environmental impact statement, *see id.* at P 54.

Two environmental groups, Healthy Gulf and Sierra Club, requested rehearing before FERC. FERC did not act on the rehearing request, so the request was deemed denied. *Driftwood Pipeline LLC*, 183 FERC ¶ 62,153 (June 22, 2023); *Driftwood Pipeline LLC*, 185 FERC ¶ 62,064 (Nov. 6, 2023); *see* 15 U.S.C. § 717r(a).

Healthy Gulf and Sierra Club then jointly petitioned for review of the certificate order, raising challenges under NEPA and the Natural Gas Act. Driftwood Pipeline and Driftwood LNG (collectively, Driftwood) have intervened in support of FERC. We have jurisdiction under 15 U.S.C. § 717r(b).

## II

We begin with petitioners' challenges to FERC's NEPA analysis. They argue that FERC violated NEPA by (1) not considering the project's effects on upstream greenhouse gas emissions, (2) not determining whether the project's overall effects on greenhouse gas emissions were significant, and (3) not considering the project's environmental effects in tandem with the Driftwood Terminal's environmental effects.

We review these challenges under the Administrative Procedure Act, applying the APA's arbitrary or capricious standard. *Sierra Club v. FERC*, 867 F.3d 1357, 1367 (D.C. Cir. 2017); *see* 5 U.S.C. § 706(2)(A). "Our role is not to flyspeck an agency's environmental analysis" but instead to "ensure that the agency has adequately considered and disclosed the environmental impact of its actions." *Birckhead v. FERC*, 925 F.3d 510, 515 (D.C. Cir. 2019) (per curiam) (cleaned up).

Applying that standard, we sustain FERC's order against petitioners' NEPA claims.[1]

## A

Petitioners first argue that the project will indirectly increase greenhouse gas emissions by spurring new natural gas drilling and that FERC acted arbitrarily and capriciously by refusing to consider these effects in its NEPA analysis.

Under NEPA, an agency need consider only those environmental effects that are "reasonably foreseeable." 42 U.S.C. § 4332(2)(C)(i); *see* 40 C.F.R. § 1508.1(g) (2022); 18

---

[1] The parties rely both on the NEPA statute and on the Council on Environmental Quality's regulations implementing NEPA. Like the parties, we refer to the versions that were in effect at the time FERC issued its certificate order in April 2023. *See Healthy Gulf v. FERC*, 107 F.4th 1033, 1039 n.1 (D.C. Cir. 2024).

In a letter submitted after oral argument, Driftwood argued that the CEQ regulations on which petitioners rely are not judicially enforceable because CEQ had no authority to promulgate them. *See* Driftwood's Fed. R. App. P. 28(j) Letter at 1–2 (Nov. 14, 2024) (citing *Marin Audubon Soc'y v. FAA*, 121 F.4th 902, 908 (D.C. Cir. 2024)). More recently, in January 2025, President Trump revoked the 1977 executive order instructing CEQ to issue NEPA regulations and directed CEQ to propose rescinding those regulations. *See* Exec. Order No. 14,154 § 5, 90 Fed. Reg. 8353, 8355 (Jan. 20, 2025) (revoking Executive Order 11,991, 42 Fed. Reg. 26,967 (May 25, 1977)). CEQ has since issued an interim rule, effective April 11, 2025, removing its NEPA regulations from the Code of Federal Regulations. *See* Removal of National Environmental Policy Act Implementing Regulations, 90 Fed. Reg. 10,610 (Feb. 25, 2025). Because (as we will explain) each of petitioners' NEPA challenges fails on its own terms, we need not and do not resolve the impact of the *Marin Audubon* decision or these other developments on this case.

C.F.R. § 380.1 (2022). We have "squarely held" that upstream emissions caused by the drilling of new wells are "reasonably foreseeable" only if the agency can reasonably predict both the "number" and the "location" of "any additional wells that would be drilled as a result of production demand created by the Project." *Food & Water Watch v. FERC*, 104 F.4th 336, 343 (D.C. Cir. 2024) (cleaned up).

Here, FERC adequately explained why it could not reasonably predict those two factors. As to the number of new wells, FERC concluded that it did not know "whether transported gas would come from new or existing production." J.A. 612. And as to their location, FERC explained that the "specific source of natural gas to be transported via the Project is currently unknown and would likely change throughout the Project's operation." *Id.* Driftwood Pipeline's application, for instance, identified several regions across the country—from the Rockies to the Gulf Coast to Appalachia—that could supply gas to the project. We have held that similar facts did not "trigger a duty to explain under NEPA." *See Food & Water Watch*, 104 F.4th at 343.

Petitioners raise several objections to FERC's analysis, none availing.

To start, petitioners claim that they can pinpoint upstream production to one specific basin: the Haynesville Shale. They rely on comments from various executives at Driftwood's parent company, Tellurian Inc., suggesting that much of the gas that reaches the Driftwood Terminal will come from Haynesville wells in northern Louisiana. But most of this evidence at best suggests that FERC could predict the "location" of any new wells; it does not suggest that FERC could predict the "number" of those wells.

Petitioners flag a specific statement from Tellurian announcing that the company "plans to drill 13 wells" in the

Haynesville shale "as it looks to build sufficient feed gas supplies to support the first phase of its proposed Driftwood LNG export terminal." J.A. 410. But it is unclear how much of this new production can be attributed to Lines 200 and 300 as opposed to the Mainline, given that both pipeline systems are expected to supply the Driftwood Terminal. Driftwood Pipeline, for instance, denied that the project would induce any new natural gas production. Petitioners' argument, moreover, fails to grapple with FERC's observation that the source of gas, and thus the location, may change over the life of the project. Tellurian could, for example, sell these upstream assets and pursue alternative supply options from other basins.

Petitioners fault FERC for not asking Driftwood Pipeline for more information about the number and location of any additional upstream wells. But FERC did request this sort of information from Driftwood Pipeline. Driftwood Pipeline, as mentioned above, responded by denying that the project would induce any new natural gas production and stating that the project would simply bring existing gas production to the Lake Charles area. Petitioners insist that FERC should have followed up with additional requests for information. But the "question of how much information to seek from regulated parties" is a "judgment call[]" that NEPA leaves "primarily to the agency." *Food & Water Watch*, 104 F.4th at 344. We have no basis to second-guess FERC's decision here when "no evidence suggests that a request would have produced useful information." *See id.* Like other pipeline operators, Driftwood Pipeline "will not drill gas wells for this project or control where others drill them." *See id.* Nor will Driftwood Pipeline select the source of the gas it transports; that decision would be made "by the shippers" that contract with Driftwood Pipeline. J.A. 651. And petitioners offer no reason to think that Driftwood Pipeline would be able to predict anticipated changes to the source of gas over time.

Petitioners also contend that FERC could have used various modeling tools to overcome any predictive hurdles. Some of these tools, petitioners argue, allow agencies to predict how production will change in response to changes in demand. But petitioners did not mention these sorts of tools in their rehearing request, so we lack jurisdiction to consider this specific objection. *See* 15 U.S.C. § 717r(b). Other tools, petitioners continue, allow agencies to convert increases in natural gas production into increases in greenhouse gas emissions. This objection was properly preserved. But it does not address FERC's core point. A tool that can convert anticipated gas production into an emissions estimate is of little use if FERC cannot predict the amount of new gas production in the first place.

**B**

FERC discussed in some detail the project-related greenhouse gas emissions it could reasonably predict. To "contextualize" those emissions, it compared them to the total greenhouse gas emissions from the United States and to Louisiana's emissions-reduction goals. Certificate Order, 183 FERC ¶ 61,049, at PP 58–60. FERC also estimated the dollar-value impact of those emissions using the "social cost of carbon," "a tool that puts a dollar figure on every ton of emitted greenhouse gases." *Ala. Mun. Distribs. Grp. v. FERC*, 100 F.4th 207, 214 (D.C. Cir. 2024); *see* Certificate Order, 183 FERC ¶ 61,049, at PP 62–63.

Petitioners argue that FERC acted arbitrarily and capriciously by refusing to go further and characterize the project's effects on greenhouse gas emissions as "significant" or "insignificant." They claim that FERC could have done so using the social cost of carbon protocol. But FERC adequately explained why it did not do so. It determined that "there are no criteria to identify what monetized values are significant for

NEPA purposes" and that it was "currently unable to identify any such appropriate criteria." Certificate Order, 183 FERC ¶ 61,049, at P 61. The protocol, in other words, simply monetizes the costs of greenhouse gas emissions; it does not also translate that dollar figure into a significance determination. "[W]e have previously found this rationale sufficient to survive APA review, and we see no basis to deviate now." *Healthy Gulf v. FERC*, 107 F.4th 1033, 1041–42 (D.C. Cir. 2024) (citing *Ctr. for Biological Diversity v. FERC*, 67 F.4th 1176, 1183–84 (D.C. Cir. 2023); *EarthReports, Inc. v. FERC*, 828 F.3d 949, 956 (D.C. Cir. 2016)).

Petitioners argue that a NEPA regulation promulgated by the Council on Environmental Quality nevertheless compels FERC to apply the "social cost of carbon" protocol to gauge significance. *See* 40 C.F.R. § 1502.21(c) (2022). Petitioners are incorrect. That CEQ regulation says that agencies shall apply "theoretical approaches or research methods generally accepted in the scientific community" to evaluate "reasonably foreseeable significant adverse impacts" when the relevant information "cannot be obtained because . . . the means to obtain it are not known." *Id.* Again, however, FERC explained that "there are no criteria to identify what monetized values are significant for NEPA purposes." Certificate Order, 183 FERC ¶ 61,049, at P 61. And petitioners have not shown that the social cost of carbon is "generally accepted" for the purpose of making such significance determinations. FERC also explained—and petitioners do not contest—that it was unaware of "any other currently scientifically accepted method that would enable the Commission to determine the significance of reasonably foreseeable GHG emissions." *Id.* That explanation addresses any Section 1502.21(c) problem.

Petitioners also argue that FERC regularly makes significance determinations in other contexts without applying

objective, bright-line criteria. But petitioners do not dispute FERC's premise that it has yet to find a way to "non-arbitrarily determine when identified social costs become significant under NEPA." *See Healthy Gulf*, 107 F.4th at 1042. Nor have petitioners provided any criteria of their own that FERC could have used. That leaves us with petitioners' "bare assertion that the Commission should have further assessed the significance of climate impacts. But that assertion, unsupported by a validly raised criticism of the Commission's reasoning or any workable alternative method, affords no basis to overturn the Commission's finding." *Food & Water Watch v. FERC*, 28 F.4th 277, 290 (D.C. Cir. 2022); *see also Healthy Gulf*, 107 F.4th at 1042.[2]

## C

For their final NEPA challenge, petitioners argue that FERC should have considered the environmental effects of Lines 200 and 300 together with the environmental effects of the Driftwood Terminal. The projects are "connected" actions, petitioners claim, because Lines 200 and 300 are expected to come online before the Mainline and so will supply all the terminal's initial gas needs. Petitioners' Brief 26 (citing 40 C.F.R. § 1501.9(e)(1) (2022)).

Petitioners forfeited this challenge by failing to raise it in their comments on FERC's draft environmental impact statement. *See Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764 (2004). Petitioners acknowledge that they did not

---

[2] This court also recently held that neither NEPA nor FERC's regulations require FERC to label greenhouse gas emissions significant or not. *See Citizens Action Coal. of Ind., Inc. v. FERC*, 125 F.4th 229, 241–42 (D.C. Cir. 2025). We need not reach that alternative ground for denying the petition here because FERC's order withstands review on the grounds given above, which FERC clearly articulated in its order and its briefing to this court.

comment on this issue below. Reply Brief 12; Tr. of Oral Arg. 11. And they do not dispute that forfeiture is the ordinary consequence of that failure. Petitioners argue only that it was "impossible" for them to raise the segmentation argument in their comments because neither Driftwood nor FERC had at the time disclosed that Lines 200 and 300 would launch before the Mainline. Reply Brief 13. Even assuming such an "impossibility" exception to the forfeiture rule exists, it would not apply here. Driftwood clearly disclosed that it would not start construction on the Mainline until it completed construction on Lines 200 and 300. *See* Response to Environmental Information Request Issued January 13, 2022, at 4, FERC Docket Nos. CP21-465-000, CP21-465-001, CP21-465-002 (Feb. 11, 2022), Accession No. 20220211-5221. And Driftwood submitted this filing on the underlying docket well before petitioners submitted their comments on FERC's draft environmental impact statement. *See* J.A. 361 (July 5, 2022). So it was not "impossible" for petitioners to raise this specific argument below.

At oral argument, counsel for petitioners invoked a different exception to the forfeiture rule, arguing that the segmentation problem was "so obvious[]" that there was no need for a commentor to flag it specifically at the administrative level. Tr. of Oral Arg. 11–12; *see Pub. Citizen*, 541 U.S. at 765. This argument is itself forfeited because petitioners did not raise it in their briefs. *See Ark Las Vegas Rest. Corp. v. NLRB*, 334 F.3d 99, 108 n.4 (D.C. Cir. 2003).

## III

Petitioners also claim that FERC violated the Natural Gas Act. In approving Driftwood's application, FERC determined that (1) the project would serve a market need and (2) the project's public benefits would outweigh its adverse effects.

Certificate Order, 183 FERC ¶ 61,049, at PP 23–32, 78. Petitioners contest both conclusions.

We again review FERC's order for arbitrariness, *see B&J Oil & Gas v. FERC*, 353 F.3d 71, 75 (D.C. Cir. 2004), and treat the Commission's factual findings as "conclusive" if "supported by substantial evidence," 15 U.S.C. § 717r(b). Through it all, "we remain mindful that the grant or denial of a certificate of public convenience and necessity is a matter peculiarly within the discretion of the Commission." *Minisink*, 762 F.3d at 106 (cleaned up). Applying this standard, we see no basis to set aside FERC's certification decision.

**A**

Petitioners first dispute FERC's determination that the project will serve a market need. But substantial evidence supports the Commission's finding. *See* Certificate Order, 183 FERC ¶ 61,049, at PP 23–27. Three shippers have already subscribed to 96% of the project's transportation capacity. These arrangements (also known as precedent agreements) are "important, and sometimes sufficient, evidence of market need for a pipeline project." *Del. Riverkeeper Network v. FERC*, 45 F.4th 104, 114 (D.C. Cir. 2022). One shipper (Driftwood LNG) has subscribed to most of this capacity and will use the project to diversify and strengthen the Driftwood Terminal's access to natural gas. And when the project is not being used to supply the terminal, it will help meet the growing demand for gas in the Lake Charles region, according to projections set forth in an independent market study. All of this supports FERC's conclusion that the project serves a market need.

Petitioners resist this conclusion in several ways, but none of their challenges persuades.

Petitioners argue that this case resembles *Environmental Defense Fund v. FERC*, 2 F.4th 953 (D.C. Cir. 2021). There,

we held that it was arbitrary and capricious for FERC to rely "solely on a precedent agreement to establish market need" when "there was a single precedent agreement for the pipeline," the "precedent agreement was with an affiliated shipper," the Commission failed to engage with "plausible evidence of self-dealing," and "all parties agreed that projected demand for natural gas in the area to be served by the new pipeline was flat for the foreseeable future." *Id.* at 975–76.

That decision is distinguishable in every way that matters. Here, FERC relied on three precedent agreements, not just one. And although the main precedent agreement is between affiliates, FERC reasonably explained why it credited this agreement. *See City of Oberlin v. FERC*, 937 F.3d 599, 605 (D.C. Cir. 2019). In particular, FERC determined that the agreement reflected genuine market need because neither affiliate could pass on costs to existing captive customers. Certificate Order, 183 FERC ¶ 61,049, at PP 21–22, 24. Petitioners do not dispute this finding. Nor have they pointed to any other evidence of potential self-dealing. FERC, moreover, did not rely only on the precedent agreements to establish market need. It looked also to an independent market study anticipating a surge in gas demand in the Lake Charles area. Certificate Order, 183 FERC ¶ 61,049, at PP 25–27; *cf. Env't Def. Fund*, 2 F.4th at 975 (noting that the applicant never "submitted a market study to the Commission to show the need for, and benefits of, the proposed project").

Petitioners argue that the project will not benefit the Driftwood Terminal because it is redundant with the Mainline system. But FERC reasonably explained why the two projects are complementary, not redundant: Lines 200 and 300 interconnect with several pipeline networks that do not interconnect at all with the Mainline system. And the two pipeline systems have different origin points and access different pools of gas. These features, FERC explained, will

improve reliability and diversify the Driftwood Terminal's access to gas supply. Certificate Order, 183 FERC ¶ 61,049, at P 27. Gas traveling through Lines 200 and 300, moreover, can move in either direction, which will further facilitate the flow of gas throughout the Lake Charles region. *Id.*; *see also* J.A. 147–48. The Mainline system, on the other hand, does not offer such "bi-directional flow capabilities." Certificate Order, 183 FERC ¶ 61,049, at P 27.

Petitioners also emphasize that the project will serve as the Driftwood Terminal's only supply pipeline for the first few years of the terminal's operation, because Lines 200 and 300 will launch before the Mainline. But that fact only further undermines petitioners' argument. That the project may initially serve as the terminal's exclusive pipeline option (and not just as a complement or backup) reinforces FERC's market-need finding.

Finally, petitioners raise two challenges to FERC's reliance on the independent market study showing anticipated growth in demand in the Lake Charles region. First, they assert that the project cannot alleviate broader supply problems in the region because one shipper (Driftwood LNG) has contracted for almost all (92%) of the project's transportation capacity. But, as FERC explained, any capacity that the terminal does not use could be used to redirect gas to other end users in the region. *Id.* at P 23. Second, petitioners argue that the market study is flawed because it does not adequately cite its underlying data. This argument is forfeited twice over because petitioners did not raise it in their rehearing request to FERC or in their opening brief to this court. *See* 15 U.S.C. § 717r(b); *Cruz v. Am. Airlines, Inc.*, 356 F.3d 320, 333 (D.C. Cir. 2004).

**B**

Petitioners argue that FERC failed to consider the project's effects on greenhouse gas emissions when balancing the

project's benefits against its costs. But FERC did consider these effects in its balancing analysis. It discussed the project's contributions to greenhouse gas emissions in its environmental impact statement, concluded that the project was "environmentally acceptable," and referenced that determination in its balancing. Certificate Order, 183 FERC ¶ 61,049, at P 78.

*New Jersey Conservation Foundation v. FERC*, 111 F.4th 42 (D.C. Cir. 2024), on which petitioners rely, does not alter our analysis. There, the challengers argued in their rehearing request that FERC had failed to account for the project's adverse effects on land use and its effects on greenhouse gas emissions. *See id.* at 63. FERC specifically acknowledged this objection but responded by offering only a "summary of various land impacts and mitigation measures *other* than those stemming from GHG emissions and climate change." *Id.* On that distinctive record, the fact that FERC addressed only the land-use concerns, we held, supported the challengers' theory that the Commission failed to account for any emissions in its balancing. *See id.* Nothing in the record supports drawing a similar inference here.

Petitioners also argue that FERC failed to account for the project's effects on greenhouse gas emissions by refusing to assess the significance of these effects. But the conclusion does not follow from the premise: Just because FERC refused to resolve the significance of the emissions does not mean that FERC refused to consider the emissions at all. And in responding to petitioners' NEPA challenges, we have already explained why the Commission's decision not to make a significance determination was valid. The argument "fare[s] no better" when framed as a challenge under the Natural Gas Act. *Ctr. for Biological Diversity*, 67 F.4th at 1188.

**IV**

We deny the petition for review.

*So ordered.*